824 F.2d 1333
 41 Ed. Law Rep. 31
 Braden L. ALBERT, Francis J. Callard, Julie L. Jones, Gur
Melamede, Molly Mysliwiec, Demetri Orlando, Michelle
Paninos, Cathleen Perry, Amy Rozgonyi, Gregory Shin, Michael
Tilman, and Johnette Traill, Appellants,
v.
J. Martin CAROVANO, President of Hamilton College; Jane L.
Jervis, Dean of Students at Hamilton College; and
Hamilton College, Appellees.
 No. 928, Docket 87-7111.
 United States Court of Appeals,
Second Circuit.
 Argued March 5, 1987.
Decided July 21, 1987.
 
 Michael Krinsky, New York City (Terry Gross, Nicholas E. Poser, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., of counsel), for appellants.
 Edward R. Conan, Bond, Schoeneck & King, Syracuse, for appellees.
 Before OAKES and WINTER, Circuit Judges, and METZNER, District judge.*
 OAKES, Circuit Judge:
 
 
 1
 On November 14, 1986, J. Martin Carovano, president of Hamilton College, a private institution in Clinton, New York, suspended a group of twelve students for engaging in a three-day sit-in of the college's administration building following their unsuccessful attempt to meet with Carovano to discuss the college's alleged insensitivity to various racial and gender issues. The suspended students filed suit in the United States District Court for the Northern District of New York against Carovano, the college, and the dean of students, Jane Jervis. The suit sought equitable relief on the basis of several causes of action, including one premised on the college's alleged failure to satisfy the Due Process clause of the Fourteenth Amendment and another on its alleged discrimination against the students. In an opinion delivered from the bench, the court denied the students' request for a preliminary injunction and dismissed their complaint, finding that their claims did not meet the "under color of" state law requirement of 42 U.S.C. Sec. 1983.
 
 
 2
 On appeal, the students argue that their suspensions amounted to action under color of state law because the college's rules for "Maintenance of Public Order" were promulgated by the faculty in 1969 for the express purpose of complying with New York Education Law Sec. 6450, which mandates that colleges adopt and file with the State a set of disciplinary rules that must include the possibility of suspension for breaches of public order. Under any one of several theories of color of state law, appellants argue, their claims meet the requirements of a section 1983 cause of action.
 
 
 3
 In essence, this case presents us with a veritable rerun of Coleman v. Wagner College, 429 F.2d 1120 (2d Cir.1970), in which we held that under certain circumstances the State of New York's involvement in college discipline pursuant to section 6450 might be sufficient to allow us to classify as "state action" certain disciplinary decisions made by private colleges. The seventeen years that have passed since Coleman have seen significant doctrinal developments in the concepts of "state action" and "under color of state law"--not the least of which is that the concepts are not synonymous, in that while state action is action under color of law, conduct under color of law is not necessarily state action, Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 n. 18, 102 S.Ct. 2744, 2752-53 n. 18, 73 L.Ed.2d 482 (1982). Nevertheless, we feel that Coleman has retained its validity and directly governs the issues raised in this case. Accordingly, we reverse the district court's dismissal of the students' claims, and remand for further proceedings.
 
 FACTS
 
 4
 The events leading up to the appellants' suspension on November 14, 1986, are disputed. According to the "declaration" of appellant Melamede, the sit-in at Buttrick Hall was spurred by what the students saw as the college's inadequate response to several racist and sexist incidents on campus the previous year. These incidents, including slurs against black women students and repeated death threats against one of the appellants, were exacerbated in the students' minds by the college's policies regarding divestment of South African holdings and the establishment of an African-American Studies program. Apparently perceiving that the college as a whole would benefit from improved dialogue on these issues, the college began the 1986-87 school year by holding an alumni symposium on discrimination on November 7, 1986, and a debate on divestment on November 10. These programs backfired, however, as a group of students felt that remarks by an alumnus at the symposium and by President Carovano at the debate merely highlighted the Hamilton administration's insensitivity to racial and gender issues.
 
 
 5
 In the two days following the debate, members of several student organizations agreed that a group of students would attempt to meet with Carovano to discuss his remarks at the debate, the possibility of another symposium on prejudice, and the African-American study program. On Wednesday, November 12, 1986, approximately fifty to sixty students and faculty went to Buttrick Hall, where Carovano has his office.[1] They found the building essentially unoccupied because Carovano was out of town and Dean Jervis had sent the staff home early in anticipation of the demonstration. The students and faculty then congregated in the hallway of the building, where they sang songs and, at some point, decided to remain in the building until they were allowed to meet with Carovano. Despite Dean Jervis's request that they leave, the students stayed past the building's 4:30 closing time. About twenty to forty students stayed overnight in Buttrick, coming and going throughout the night. President Carovano returned to Clinton at around 9:00 p.m. and was apprised by Dean Jervis of the situation at Buttrick.
 
 
 6
 At 8:30 the next morning Dean Jervis announced to the group that pursuant to the college's rules on maintenance of public order, Buttrick had been declared off limits to students and that the college would seek a court injunction ordering them to leave. The students chose to remain. At about 1:20 p.m., the students were served with a temporary restraining order obtained by the college from the Supreme Court of New York. The students nonetheless remained in Buttrick (apparently believing that they were not in violation of the order).[2] Dean Jervis returned and again instructed the students to leave. She stated that letters warning of disciplinary action were being sent to students and their parents. Dean Jervis also maintains that she informed the students that Carovano would meet with them, but only if they left the building. Four of the appellants, however, state that they were unaware of this possibility. Some twenty to thirty students again camped out in Buttrick overnight.
 
 
 7
 At about 11:00 a.m. on Friday Dean Jervis returned to Buttrick and read a notice stating that the students were violating the court order, that Hamilton would initiate contempt of court and possibly trespass charges against the students, and that students who did not leave immediately would be suspended. After some discussion, several students left. At 1:00 p.m., after meeting with Carovano, Jervis went again to Buttrick and informed the remaining students--the twelve appellants--that they were immediately suspended for the remainder of the academic year. Letters to this effect were sent to the students and their parents. The appellants nonetheless remained in the building until 7:00 p.m. After they left Buttrick, two professors met with Jervis and arranged for some of the students to meet with Carovano on the following Monday.
 
 
 8
 On Monday morning, November 17, Carovano revised the suspension so it would become effective on December 20, 1986, the final day of the fall semester. On that same day, by a vote of 96 to 24, with one abstention, the faculty adopted a resolution calling for the suspensions to be withdrawn in order to allow the students to be disciplined according to the procedures set out in the student handbook, discussed below. No action was taken on this resolution, but Carovano did write to each of the appellants to suggest that if there were "extraordinary circumstances" that made the suspension unjust in a particular case, the student could submit a written statement for consideration by the trustees at their December 5-6 meeting. Only one student responded, and at no time did Carovano further modify the suspensions.
 
 
 9
 In Carovano's affidavit, he states that his decision to suspend the appellants "was based solely upon the conduct of the [appellants] and the disciplinary options which were available" to him. He bases his disciplinary authority on the college's A Guide to the Policies and Procedures of Hamilton College (1986), which states in its discussion of student discipline that "[t]he right of the President to decide finally on any student disciplinary matter is not precluded by the provisions outlined below." The "provisions" referred to in this statement present a detailed outline of the college's "judicial system," including a description of the student-faculty Judiciary Board and the procedures by which the Board is to operate.[3] The Guide expressly states that "certain minor infractions" may be adjudicated by the dean of students in an administrative proceeding; other infractions are to be "presented to the Judiciary Board for disposition."
 
 
 10
 Another section of the Guide, entitled "Freedom of Expression/Maintenance of Public Order at Hamilton College," sets out additional rules, regulations, and procedures governing conduct at Hamilton. This section defines "disruptions of public order" as including "physical possession of a building which denies the right of authorized persons to enter and to work in it" and "undue noise or other interference which disrupts the carrying out of an academic or noncurricular activity of the College." This section also details specific steps to be taken by the president of the college to restore order following a disruption,[4] including the seeking of a court-ordered injunction, and states that the disciplinary procedures for students who disrupt public order "shall be those set forth under 'Student Discipline,' and may result in disciplinary action of the most severe kind, including suspension or expulsion."
 
 
 11
 As the Guide itself states, these provisions for "maintenance of public order" were promulgated by Hamilton "in compliance with" New York Education Law Sec. 6450. Section 6450, which was adopted by the legislature in 1969 in response to various incidents of student unrest in New York State, requires chartered colleges to adopt rules and regulations for the maintenance of public order on campus and to file these regulations with the board of regents and the commissioner of education.[5] Specifically, the statute states that "[t]he penalties for violations of such rules and regulations shall be clearly set forth therein and shall include provisions for ..., in the case of a student or faculty violator his suspension, expulsion or other appropriate disciplinary action." Prior to adoption of section 6450, Hamilton's student handbook had simply stated, "Conduct becoming a gentleman is expected of Hamilton men at all times." According to the 1967 handbook, conduct in violation of this standard was subject to discipline by the Judiciary Board, with the penalty of suspension reserved for "extremely serious misconduct."
 
 PROCEEDINGS BELOW
 
 12
 The twelve suspended students commenced this action on November 26, 1986, in the United States District Court for the Northern District of New York before Judge Cholakis. Their complaint, which sought only injunctive relief, stated three causes of action allegedly "aris[ing] under" the Due Process clause of the Fourteenth Amendment and 42 U.S.C. Sec. 1983. The first cause of action alleges that Carovano's suspension of the students without a hearing falls short of due process, that Hamilton was induced by section 6450 "to adopt a more severe attitude to campus disruption and to impose harsher sanctions on unruly students," and that the students would be irreparably injured by their suspension. It notes faculty votes supporting resolutions that the failure to provide a hearing violated Hamilton's own procedures. The second cause of action charges Hamilton with failing to follow the disciplinary procedures set out in the Guide, a claim that the parties agree states a cause of action under state law. See Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980). Finally, the third cause of action contends that the college violated the Fourteenth Amendment's Equal Protection and Due Process clauses by "selectively enforcing" Hamilton's rules against the students "because they are black, Latin or gay; supportive of the rights of blacks, Latins and gays and without old family ties to Hamilton."
 
 
 13
 The court moved quickly on the students' request for a preliminary injunction by issuing an order to show cause. After the defendants countermoved for dismissal under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) and affidavits were submitted, the court heard oral argument on December 19, 1986. Sua sponte, the court scheduled an evidentiary hearing on the issue of "state action" for December 23. At this hearing the court heard testimony and reviewed exhibits submitted by both parties. In an oral opinion, the court found, first, that there would be irreparable harm to the students if an injunction did not issue and, second, that "it appears that the President may not have followed the proper procedure in suspending" the appellants. Nevertheless, the court concluded that the first and third causes of action, both of which it characterized as section 1983 claims, must be dismissed because New York did not "intrude[ ] into the workings of Hamilton College, or any other College within the State of New York to the extent that such activities by the President or the Dean of Students could be or would be considered State action, or action under color of State Law or authority." The court then dismissed the pendent state law claim.
 
 
 14
 The students appealed this decision on January 9, 1987, and moved for an injunction pending appeal. We granted a limited injunction to allow the students to attend classes and participate in academic activities at Hamilton pending oral argument. Albert v. Carovano, No. 87-8003 (2d Cir. Jan. 30, 1987). Upon motion by the parties, we extended this stay pending the issuance of this opinion.
 
 DISCUSSION
 
 15
 We note preliminarily that Carovano's motion for dismissal was predicated both on lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and on failure to state a claim under Rule 12(b)(6). As to the Rule 12(b)(1) motion, "when the contested basis of federal jurisdiction is also an element of plaintiff's asserted federal claim, the claim should not be dismissed for want of jurisdiction except when it 'appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.' " AVC Nederland B.V. v. Atrium Investment Partnership, 740 F.2d 148, 152-53 (2d Cir.1984) (quoting Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1945)). Here, because the students' federal claims are neither frivolous nor immaterial, and because Carovano's motion is based solely on the lack of any action by the defendants under color of state law, we treat the motion as an attack on the merits of the claim pursuant to Rule 12(b)(6). See Malak v. Associated Physicians, Inc., 784 F.2d 277, 279-80 (7th Cir.1986); Williamson v. Tucker, 645 F.2d 404, 415-16 (5th Cir.1981). This does not end the procedural wrangle, however, as Rule 12(b) requires that the 12(b)(6) motion be treated as a motion for summary judgment under Rule 56 when matters outside the pleading are presented to and not excluded by the court. This being the case here, the proper standard by which the district court should have considered Carovano's motion, and which we apply de novo on appeal, is whether there is a "genuine issue as to any material fact" or whether "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2509-12, 91 L.Ed.2d 202 (1986). And, in determining whether factual issues exist, we must view all the evidence in the light most favorable to the nonmoving party. Shockley v. Vermont State Colleges, 793 F.2d 478, 481 (2d Cir.1986).
 
 
 16
 In order to state a viable claim under 42 U.S.C. Sec. 1983, plaintiffs must allege, first, that the conduct complained of has deprived them of a constitutionally protected right and, second, that the defendant acted "under color of any statute ... of any State." Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Here, the plaintiffs allege that the defendants' conduct violated the Due Process and Equal Protection clauses of the Fourteenth Amendment. If plaintiffs succeed in making out this allegation, then they automatically satisfy the "under color state law requirement" too. For as the Supreme Court stated in Lugar, to show they were deprived of a constitutionally protected right, "plaintiffs had to demonstrate that [the challenged conduct] was accomplished by state action," 457 U.S. at 930, 102 S.Ct. at 2750. By so doing they satisfy the second prong of the Adickes standard, because "[i]f the challenged conduct ... constitutes state action ..., then that conduct was also action under color of state law and will support a suit under Sec. 1983." Id. at 935, 102 S.Ct. at 2752.
 
 
 17
 Our inquiry is thus whether the action taken by Carovano and Jervis, concededly private individuals, and by Hamilton, a private college, in suspending the twelve appellants can be considered "state action" for purposes of the Fourteenth Amendment.[6] In Lugar, 457 U.S. at 937, 102 S.Ct. at 2753-54, the Court described the state action requirement as ensuring "that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." See also Blum v. Yaretsky, 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982) (in "those cases in which the defendant is a private party ... the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment"). The question whether a private party's conduct is "fairly attributable" to the state is governed by a two-part standard set out in Lugar:
 
 
 18
 First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.
 
 
 19
 457 U.S. at 937, 102 S.Ct. at 2753-54; see also Dahlberg v. Becker, 748 F.2d 85, 89 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985).
 
 
 20
 Turning to the first part of Lugar's standard, the students claim that section 6450 amounts to a state-imposed rule of conduct. They argue it was intended to be, and has been applied as, a command to colleges to adopt a particular system of regulation of conduct on campuses and other college property. We addressed this very same argument in Coleman. The majority in Coleman noted that section 6450 on its face does not require colleges to secure approval of the rules drafted and filed pursuant to the section, to proscribe specific activities as violations of public order, or to designate any penalty, though it does require college officials to provide for the sanction of ejection and, in the case of students and faculty members, for "appropriate disciplinary action," including suspension and expulsion. See 429 F.2d at 1124. Even so, the Coleman majority remanded on the theory that while section 6450 did not appear to enact substantive rules of conduct for colleges, it may in fact have been "intended or applied as a command to the colleges of the state to adopt a new, more severe attitude toward campus disruption and to impose harsh sanctions on unruly students." Id. Essentially, whether action taken upon the impetus of section 6450 could be considered state action was seen as a factual question. One factor going to the state action issue was said to be the "actions of the state officials with whom the rules and regulations are to be filed," for example, whether they believe themselves empowered to look into substantive inadequacies or otherwise to exert influence upon the content of the rules and regulations. Another factor was the attitude of college administrators, particularly whether they had a wide-spread belief that they were required by the statute or by state officials to adopt a particular stance toward campus demonstrators. 429 F.2d at 1125.
 
 
 21
 The appellees argue that subsequent Supreme Court decisions, particularly Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), have undermined the theory behind Coleman sufficiently to make it inapposite here. We disagree, for the cases on which appellees rely are distinguishable from the present case. Blum involved a suit against a state agency responsible for providing Medicaid assistance to eligible individuals who receive care in private nursing homes. The plaintiffs attempted to hold the State responsible for decisions to discharge or transfer patients made by the nursing home without notice or an opportunity for a hearing. Despite significant federal involvement through financial assistance and regulations regarding procedures for determining whether the patient was receiving appropriate care, the Court found no state action because the decisions about which the plaintiffs complained were made by private physicians and administrators without any influence by the State. 457 U.S. at 1005, 102 S.Ct. at 2786; see Kraemer v. Heckler, 737 F.2d 214, 219 (2d Cir.1984). In Blum, no particular rule of conduct established by the state was challenged as such; all the State did was react to the nursing homes' decisions by lowering or terminating Medicaid benefits. See 457 U.S. at 843, 102 S.Ct. at 2772-73 (White, J., concurring in Blum and its companion case, Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)). Rendell-Baker is similarly distinguishable. There, employees of a private school operated almost entirely on public funds and regulated extensively by the state challenged their firing by the school on various constitutional grounds. The Court found no state action, considering it dispositive that "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation." 457 U.S. at 841, 102 S.Ct. at 2771; see also id. at 844, 102 S.Ct. at 2773 (White, J., concurring).
 
 
 22
 Although the Court found no state action in Blum or Rendell-Baker, it expressly reaffirmed the validity of the principle underlying Coleman when it stated, "[A] State normally can be held responsible for a private decision ... when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum, 457 U.S. at 1004, 102 S.Ct. at 2786 (emphasis added). What Coleman tells us is that even though section 6450 may not appear on its face to dictate the outcome of campus disciplinary decisions, there is still a factual question as to whether the State intended to or did in fact influence college administrators in such a way that it can be considered responsible for the private colleges' decisions.
 
 
 23
 Here, sufficient proof was adduced by the students, even in the absence of discovery, to suggest that passage of section 6450 strongly influenced the content of college disciplinary codes, including Hamilton's. For example, at a meeting with representatives of several colleges in 1969, the legal counsel to the New York State Education Department indicated that the legislature intended that the institutions not exercise as much forbearance as they had in the past. He also testified that he believed proposed rules that did not include suspension as a possible penalty for violation of the substantive rules pertaining to campus demonstrations were insufficient under the statute and would be rejected. In light of the testimony of Hamilton administrators and faculty members who were present during the debate over the import of section 6450, there is little doubt that Hamilton would never have adopted the new regulations and the policy reflected therein had it not been required to do so by the State. There was also testimony that promulgation of the new regulations "created a definite change in the manner in which the administration dealt with student unrest on campus."
 
 
 24
 On the whole, we find sufficient evidence in the record at least to raise a significant factual issue as to the state's responsibility for the substantive content of the regulations adopted by Hamilton in order to comply with section 6450. The fact that there has been a considerable lapse of time since passage of section 6450 and the adoption of Hamilton's regulations is by no means dispositive; what is important is that the rule of conduct imbedded in the regulations may well have been established as a result of the statute, and is looked to by beleaguered administrators for support. At the same time, we are not persuaded by the appellees' clever argument that Carovano's suspension of the students could not have been pursuant to a state-imposed rule of conduct because Carovano did not follow the rules prescribed in the Guide. See Lugar, 457 U.S. at 941, 102 S.Ct. at 2756 ("private misuse of a state statute does not describe conduct that can be attributed to the State"). As the appellants point out, when the college's decision to discipline students is made pursuant to a state-imposed rule of conduct, the fact that the college allegedly failed to accord the students the requisite procedural protections afterward does not make the original decision any less a product of state action.
 
 
 25
 This brings us to the second part of Lugar 's test for state action, the requirement that "the party charged with the deprivation [of a protected right] must be a person who may fairly be said to be a state actor." 457 U.S. at 937, 102 S.Ct. at 2754. In Lugar, the Court recognized that a determination of when a private party can be characterized as a "state actor" under one of the various tests articulated by the Court is "necessarily [a] fact-bound inquiry." Id. at 939, 102 S.Ct. at 2754-55; see Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."). Reviewing the evidence presented here, we find that the appellants have raised sufficient factual issues as to the appellees' status as state actors to survive a motion for summary judgment.
 
 
 26
 In particular, the appellants have raised factual issues under the so-called "state compulsion" theory. See Adickes v. S.H. Kress & Co., 398 U.S. at 170-71, 90 S.Ct. at 1615. Under this theory, a private party's actions are "otherwise chargeable to the State," Lugar, 457 U.S. at 937, 102 S.Ct. at 2754, "when the State, by its law, has compelled the act." Adickes, 398 U.S. at 170, 90 S.Ct. at 1615; see also Peterson v. City of Greenville, 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963). But, as the Court expressly noted in both Blum and Rendell-Baker, a private party becomes a state actor not only by state coercion but also when the State has provided "significant encouragement, either overt or covert," for the actions of the parties. Blum, 457 U.S. at 1004, 102 S.Ct. at 2786; Rendell-Baker, 457 U.S. at 840, 102 S.Ct. at 2771.
 
 
 27
 Here, the appellants have presented testimony showing that New York state encouraged, if not required, private colleges to take a stronger disciplinary stance toward disruptions of "public order." As we noted above, testimony by Hamilton personnel showed that at least some of those involved in writing the new regulations thought they had no choice but to vote for the regulations due to section 6450's "severe intrusion on the autonomy of Hamilton College," and showed that the new regulations did not reflect the faculty's "independent professional judgment as to what was best for Hamilton as an educational institution." Additionally, not only did state officials encourage college administrators to submit revised disciplinary rules to comply with section 6450, but they also believed that administrators were legally bound to enforce the regulations they promulgated under section 6450. See Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980) (recognizing student's claim against college for failing to follow published disciplinary procedures). In sum, we find the evidence adduced by the appellants sufficient, at least, to raise a substantial question as to whether the State coerced or "significantly encouraged" the colleges to take strict disciplinary action against campus disturbances. Contrary to appellees' claims, the record contains evidence tending to show much more than New York's "[m]ere approval of or acquiescence in," Blum, 457 U.S. at 1004, 102 S.Ct. at 2786, the type of disciplinary action taken by Caravano against the students here.
 
 
 28
 To recapitulate, we find that the district court erred by dismissing the appellants' claims for failure to show that the appellees' conduct could be considered state action. We find that the evidence presented by the students shows that there is a genuine dispute over the material issues of whether the decision to suspend the students is "fairly attributable" to the State under Coleman and whether the State "substantially encouraged" the disciplinary action taken by Carovano.
 
 
 29
 The appellants next challenge as error the court's dismissal of its third cause of action alleging discriminatory and selective enforcement of Hamilton's disciplinary rules. The district court rather summarily rejected the students' argument that this cause of action stated a claim under 42 U.S.C. Sec. 1981, and instead treated the claim as one under section 1983, which it then dismissed for lack of conduct under color of state law. Appellants now argue, and we agree, that the third cause of action contained in their complaint does state a valid section 1981 claim. Although the complaint does not specifically mention section 1981, it does state in part that "because [the students] are black, Latin or gay," the college had selectively enforced its disciplinary rules, and that "[t]his selective enforcement of the College's rules violates the Fourteenth Amendment's equal protection and due process clauses." This statement, coupled with the other facts alleged in the complaint, amounts to more than the mere "naked assertions" which we have in the past found inadequate to state a section 1981 claim. See Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir.1978). And, as we recognized in DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 311-12 (2d Cir.), modified on other grounds, 520 F.2d 409 (1975), a white person who suffers reprisals as a result of efforts to vindicate the rights of nonwhites has standing to sue under section 1981. Accordingly, we reverse the district court's dismissal of the third cause of action and remand for fuller consideration of the claim.
 
 
 30
 In addition, having reversed the district court's dismissal of the students' first and third claims, we also reverse the dismissal of the second, pendent state-law claim and remand for further consideration of that claim.
 
 
 31
 Finally, appellants ask that this court grant their earlier motion for a preliminary injunction, basing their request on the district court's statements that it appeared that Carovano had failed to follow proper procedures and that the students would be irreparably harmed by the suspension. We decline to do so, however, and instead remand to the district court for full consideration of the propriety of a preliminary injunction here in light of this opinion and the standards set out in Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir.1979).[7]
 
 
 32
 Reversed and remanded.
 
 WINTER, Circuit Judge, dissenting:
 
 33
 The sweeping opinion in this case subjects to federal judicial review virtually every decision disciplining students for disruption by a private college or university in the State of New York. Additionally, the opinion creates unprecedented rights of action against colleges and universities in the circuit under Section 1981. Because I believe that: (1) even if the fourteenth amendment applies, these plaintiffs were afforded all the procedural protection that due process requires; (2) under clearly established precedent, the actions of Hamilton College's administrators and Board of Trustees do not constitute "state action" and therefore do not implicate the fourteenth amendment; and (3) under clearly established precedent, the plaintiffs' complaint does not allege a claim under Section 1981, I respectfully dissent.
 
 
 34
 * My colleagues limit their discussion of due process to the state action question on the unstated assumption that Hamilton College never afforded appropriate notice or a hearing to the plaintiffs regarding their suspension. I disagree with that assumption.
 
 
 35
 On November 26, 1986, nearly one month before the suspensions went into effect, President Carovano wrote a letter to each of the plaintiffs offering them an opportunity to state their views in writing to Hamilton's Board of Trustees. The pertinent portion of this letter states:
 
 
 36
 At their December 5-6 meetings, I will be reporting to the members of the Board of Trustees on the events which led to your suspension from Hamilton and on what has transpired since then. If you would like to share with the Trustees your views on what has happened, you may do so by writing to William M. Bristol III, Chairman, Hamilton Board of Trustees, 465 Pineville Road, Newtown, Pennsylvania 18940-3109. If you write to him, I suggest that you also send him a copy of your letter in care of the College to insure that he receives it before the next meeting of the Board. Whatever is sent to him here will be held for him unopened.
 
 
 37
 The letter also invited each plaintiff to convey to Carovano any "extraordinary circumstances" justifying his lessening of the penalty in an individual case. The plaintiffs were thus offered a formal and unlimited opportunity to state their case in writing to the College's ultimate governing authority. Although one student may have taken the opportunity to do so, the offer was otherwise spurned. The question then is whether, assuming the existence of state action and a cognizable property interest in continued enrollment,[1] Carovano's offer afforded the plaintiffs the due process required by the fourteenth amendment. I believe it did.
 
 
 38
 I begin with the proposition that Carovano's failure to follow the disciplinary procedures outlined in Hamilton's A Guide to the Policies and Procedures of Hamilton College (1986) is irrelevant to the federal due process issue. His failure may afford the students a viable action under state law, see Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302, (1980), although the Guide suggests that the President was free to ignore those procedures.[2] Federal due process would be satisfied, however, if the plaintiffs were afforded the minimum procedural protection demanded by federal law, whether or not Hamilton followed its own rules.
 
 
 39
 The Supreme Court has not had an occasion to instruct us on the precise procedural requirements of due process in the case of the suspension of students accused of state college disciplinary offenses.[3] As is true of adjudicative tribunals generally, however, the procedures required turn on the nature of the issues that must be decided. I therefore limit my discussion to the facts of the instant case.
 
 
 40
 The students here were charged with the overnight occupation of Hamilton College's main administration building. It was undisputed then and is undisputed now that these plaintiffs continued their occupation after being repeatedly notified orally and in writing by the College that their occupation of the building was impermissible and that they would be suspended if they did not leave. Accordingly, they had full notice of the nature of the charges against them. The fact that the students may have subjectively believed that their occupation was permissible or justified is simply irrelevant so long as they knew that the university officials disagreed, had asked them to leave and had announced that sanctions would be imposed if the students continued their occupation. There is no federal right to occupy university buildings against the wishes of that university because one subjectively believes that such an occupation is consistent with university rules or justified by higher social or political concerns. Moreover, nothing in the fourteenth amendment forbids university officials from imposing suspension as a sanction for such conduct. For due process purposes, therefore, there was neither an issue of fact nor an issue of "law" for which a hearing was necessary.
 
 
 41
 The sole issue on which a hearing might have shed light was the appropriateness of Hamilton's discretionary resort to the clearly lawful sanction of suspension for the occupation of a building. Carovano's formal invitation to the plaintiffs to state their views to Hamilton's ultimate governing body offered them a full hearing on this question. The only room for dispute is whether federal due process affords a right to appear in person before such a governing body in order to make an oral plea. I know of no authority suggesting that it does. This was not a criminal proceeding, and the invitation to submit a statement in writing allowed these plaintiffs a full opportunity to express whatever they wanted to say to the Trustees. Plaintiffs do not claim otherwise. Instead, they demand a full trial, including testimony and cross-examination, presumably not to adjudicate facts they concede, but apparently to further elaborate their views on the issues that were the subject of their occupation of the building. I know of no authority endorsing a right to such a proceeding.
 
 II
 
 42
 With regard to the state action issue, existing case law does not justify attributing Hamilton's actions to state compulsion. Powe v. Miles, 407 F.2d 73 (2d Cir.1968), and Coleman v. Wagner College, 429 F.2d 1120 (2d Cir.1970), the relevant precedents in this Circuit, command precisely the opposite result. Powe directly held that the actions of private colleges are not state action under the fourteenth amendment. Relying upon Coleman, my colleagues hold that Section 6450 triggers the so-called "state compulsion" rule under the state action doctrine. Coleman, however, is to the contrary. The court described the pertinent statute thusly:
 
 
 43
 [T]he "regulation" of college discipline embodied in section 6450 appears almost devoid of meaningful content. Colleges are not required to secure approval of rules and regulations drafted pursuant to the section but merely to file them with the designated officials. The statute does not proscribe specific activities or types of conduct as violations of the public order of the campus. No penalty is designated; although college officials are required to have the sanction of ejection (and, in the case of students and faculty members, an "appropriate disciplinary action") at their disposal, they are not required to use it. One wonders whether rules and regulations consisting solely of the statement that any individual guilty of a transgression against the public order of the campus shall be required to give the Dean of the College a rose and a peppercorn on Midsummer's Day would satisfy the literal command of the statute in all respects.... If the statute is applied in accordance with its literal meaning, regulations filed pursuant to its provisions and disciplinary proceedings instituted pursuant to these regulations are the product and responsibility of private individuals and not of the state.
 
 
 44
 429 F.2d at 1124. We then went on to say: "We are, however, cognizant of the possibility that the statute may have been intended, or may be applied, to mean more than it purports to say." Id.
 
 
 45
 We thus remanded the case for a hearing on whether "section 6450 represents a meaningful state intrusion into the disciplinary policies of private colleges and universities." Id. at 1125. We directed that the remand focus largely on two issues. The "[m]ost significant" issue was whether state officials regarded their statutory responsibilities as being more than ministerial and believed that they had the power to impose substantive requirements or the right to interfere in the enforcement of university or college regulations. Id. We also indicated that inquiry into the "attitude of the college administrators" would be appropriate on remand but that we would be "loath" to hold that the state action doctrine is triggered because of a private individual's misunderstanding of the law. Id. However, we stated that "[a] reasonable and widespread belief among college administrators ... that section 6450 required them to adopt a particular stance toward campus demonstrators would seem to justify a conclusion that the state intended for them to pursue that course of action." Id. (emphasis added).
 
 
 46
 The present decision is a plain departure from the holding in Coleman. First, no evidence in the record creates a material issue of fact over the existence of a "widespread" understanding among college administrators that some particular form of regulation or enforcement thereof is required under Section 6450. There is only evidence that some members of the Hamilton faculty seventeen years ago were under the impression based on double hearsay that Section 6450 required adoption of the Guide. Even with regard to Hamilton's actions at that time, such evidence is hardly relevant because the Trustees rather than the faculty actually adopted the Guide. Moreover, the relevant inquiry under Coleman concerns the attitudes of college administrators throughout New York State, not those of a single college.
 
 
 47
 Second, Coleman expressly held that the state action doctrine is not triggered unless the belief that Section 6450 compels college and university officials "to adopt a particular stance" is "reasonable " as well as "widespread." My colleagues abandon the reasonableness prong of the Coleman test. If applied, of course, the reasonableness requirement would render the circumstances of seventeen years ago wholly irrelevant. The issue in the present case is whether anyone in 1986 could have reasonably believed that the disciplining of these plaintiffs was encouraged or compelled by Section 6450. Even if Hamilton's Trustees believed in 1970 that the Guide had to be adopted as written, they have had some seventeen years to be disabused of that notion, to amend anything in the Guide they do not like, and certainly to learn that the Guide need not be mechanically enforced. They were free then and are surely free now to take the position that occupation of a university building is not a disciplinary violation. Id. at 1124. ("The statute does not proscribe specific activities or types of conduct as violations of the public order of the campus.").
 
 
 48
 Indeed, the "most significant" question causing the remand in Coleman --the attitudes and actions of state officials--has now been indisputably answered. In the seventeen years since Section 6450 was enacted, no state official has compelled any college or university within New York State to promulgate any particular disciplinary regulation or to impose any particular sanctions for disturbances. No such official has ever attempted to compel any college or university within New York to enforce its disciplinary regulations as promulgated or to discipline particular students for violation of those regulations. The state officials have at all times viewed their responsibility as limited solely to the ministerial task of receiving and filing of the codes of conduct described in Section 6450.
 
 
 49
 At the evidentiary hearing in the present case, Robert D. Stone, the State Education Department's highest ranking lawyer, testified as follows:
 
 
 50
 Q: And you had no direct involvement, did you, sir, and [sic] Hamilton College's decision to suspend plaintiff [sic] in this action?
 
 
 51
 A: None whatsoever, direct or indirect.
 
 
 52
 Q: Are you aware of anyone in your department who had direct involvement in Hamilton's decision on this?
 
 
 53
 A: I have [sic] not.
 
 
 54
 Q: In your memorandum of May 8, 1969, you did not list as one of the criteria to be contained in a college's submission, an insistence that a specific remedy be employed in every specific instance of defined misconduct, did you?
 
 
 55
 A: We did or do not.
 
 
 56
 Q: And in fact, the enforcement of a college's own rules and regulations with respect to the maintenance of public order in a particular situation was left to the college's judgment, was it not?
 
 
 57
 A. It was.
 
 
 58
 The plaintiffs do not contest the accuracy of this testimony. It is thus clearly unreasonable, indeed inconceivable, for a college administrator in 1986 to have believed that Section 6450 affected disciplinary decisions in any way. Moreover, there is no evidence whatsoever--none--that either Carovano or Hamilton's Trustees were in any way influenced, much less coerced, in their actions by Section 6450 or by any state official.
 
 
 59
 Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), is thus wholly inapplicable. Under that decision, the complaining party must demonstrate that the precise decision challenged--here, the suspension of appellants by a private college's President and Trustees--can be "fairly attributable to the State." Id. at 937, 102 S.Ct. at 2753. No such demonstration has been made here. First, nothing in Section 6450 required that Hamilton suspend these students for occupying Buttrick Hall. Carovano, to quote our decision in Coleman, was "not required" to use sanctions at all or simply could have required them "to give the Dean of the College a rose and a peppercorn on Midsummer's Day." 429 F.2d at 1124. Second, no state official compelled, encouraged, or even knew of Carovano's decision. Carovano's decision to suspend the students on November 14, 1986 is thus not "otherwise chargeable to the State." Lugar, 457 U.S. at 937, 102 S.Ct. at 2754.[4]
 
 
 60
 In fact, there is a serious question whether Coleman, even as I understand that decision, is good law in light of the subsequent decision of the Supreme Court in Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In Blum, a class of Medicaid patients challenged decisions of private nursing homes to transfer patients without affording them either notice or a hearing. The patients claimed that the transfers were attributable to the State of New York because state regulations required the homes "to make all efforts possible to transfer patients to the appropriate level of care or home as indicated by the patient's medical condition or needs." Id. at 1007-08, 102 S.Ct. at 2787 (quoting N.Y.Comp.Codes R. & Regs. tit. 10, Secs. 416.9(d)(1), 421.13(d)(1) (1980)). In particular, the regulations "encouraged for efficiency reasons" the "downward" transfer of patients to "lower levels of care." Id. at 1008 n. 19, 102 S.Ct. at 2788 n. 19 (emphasis added). To achieve this goal, New York law required the nursing homes to complete detailed patient care assessment forms designed by the state when making decisions to transfer or discharge patients. The nursing homes were further required to file the completed assessment forms with state officials, who were, in turn, required by federal regulations to use the assessments to approve or disapprove Medicaid funding. Id. at 1010, 102 S.Ct. at 2789.
 
 
 61
 The gauntlet of state regulation in Blum was expressly described by the Court as "encourag[ing]" nursing homes to reduce costs--"to adopt a particular stance," Coleman, 429 F.2d at 1125--and imposed recordkeeping and filing requirements to that end. 457 U.S. 1008 n. 19, 102 S.Ct. at 2788 n. 19. Nevertheless, the Supreme Court held that the transfer decisions of the nursing homes did not constitute state action because such decisions "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." Id. at 1008, 102 S.Ct. at 2788 (footnote omitted). Accordingly, the transfer decisions were not compelled by a state-imposed rule of conduct. See Rendell-Baker v. Kohn, 457 U.S. 830, 843, 102 S.Ct. 2764, 2772-73, 73 L.Ed.2d 418 (1982) (White, J., concurring in judgment in Blum ).
 
 
 62
 Blum thus appears to be inconsistent with even my understanding of Coleman and clearly controls here. Plaintiffs, for example, do not suggest that either Section 6450 or any New York official has set forth criteria for disciplinary decisionmaking with a specificity even remotely resembling that in the assessment forms in Blum. Nor is Hamilton College required to report its disciplinary decisions to the state. Finally, even if the State of New York had specifically required Hamilton to adopt the rules contained in the Guide in order to "encourage" a more rigorous response to disruption, the ultimate power of decision in individual cases would nonetheless rest with the college. Such disciplinary action would "ultimately turn on ... judgments made by private parties according to professional standards that are not established by the State." Blum, 457 U.S. at 1008, 102 S.Ct. at 2788. It would thus not be state action.
 
 
 63
 Moreover, my colleagues' reliance upon Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963), leads to a bizarre result. In Peterson, a municipal ordinance forbade restaurants from serving blacks and whites in the same room. The court held that in light of that ordinance the use of the police to exclude desegregated diners was state action whether or not the restaurant owner had a private preference for segregated dining. Similarly, in Adickes, there was a "custom" of segregated dining that fell within the meaning of Section 1983 allegedly enforced by local police and by "threats of violence" tolerated by the state. 398 U.S. at 172, 90 S.Ct. at 1616.
 
 
 64
 Neither case was thus a procedural due process case. Instead, they were decisions designed to ensure that a state cannot evade constitutional limits on its conduct imposed by the fourteenth amendment by hiding beyond private parties claiming to act in their own right. Reliance upon these decisions in the present case leads to the result that Hamilton College may not discipline students at all for disturbing public order. My colleagues' logic is that Hamilton College does not want to have a rule against the occupation of buildings but is coerced by the state to promulgate and enforce such a rule. Yet even if Section 6450 coerced Hamilton College to discipline the plaintiffs, it in no way compelled the school to discipline them without due process.[5] Under today's decision, the impermissible goal sought by the state must therefore be the discipline itself.
 
 III
 
 65
 With regard to the Section 1981 claim, which does not require a finding of state action and thus applies to all private colleges and universities, I believe the present decision is flatly inconsistent with established precedent. Section 1981 guarantees to "[a]ll persons" the same rights as "enjoyed by white citizens." 42 U.S.C. Sec. 1981 (1982). Essential to an action under Section 1981 is an allegation that the defendants' acts were purposefully discriminatory, General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982), and racially motivated. Keating v. Carey, 706 F.2d 377, 384 (2d Cir.1983). The statute's reference to rights enjoyed by white citizens establishes "the racial character of the rights being protected." McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 293, 96 S.Ct. 2574, 2585, 49 L.Ed.2d 493 (1976) (quoting Georgia v. Rachel, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966)).
 
 
 66
 The conclusory allegations in appellants' complaint are not sufficient to plead purposeful, racial discrimination. We have repeatedly required that a complaint under Section 1981 set forth facts that go beyond mere "naked assertions" of racial discrimination. Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir.1978). In Birnbaum v. Trussell, 347 F.2d 86, 87 (2d Cir.1965), we held that the mere allegation that the plaintiff was fired because of race did not state a Section 1981 claim.
 
 
 67
 Here, plaintiffs allege only that they were selectively disciplined because they are "black, Latin or gay; supportive of the rights of blacks, Latins and gays and without old family ties to Hamilton." That allegation hardly rises to the specificity required by our decisions. Moreover, Section 1981 does not protect the rights of gays, those who are supportive of gays, or those without old family ties to Hamilton College. The statute only protects those who allege discrimination because of race or ethnic characteristics. See Saint Francis College v. Al-Khazraji, --- U.S. ----, 107 S.Ct. 2022, 2026-28, 95 L.Ed.2d 582 (1987); Zemsky v. City of New York, 821 F.2d 148, 150-51 (2d Cir.1987). This limitation on Section 1981's scope proves fatal to plaintiffs' claim because there is nothing in the complaint or in the record alleging or showing the race or ethnicity of any of the individual plaintiffs. We are thus unable to determine which plaintiffs have an action under Section 1981 and may be entitled to injunctive relief. See Stanley v. City of New York, 587 F.Supp. 393, 396 (E.D.N.Y.1984).
 
 
 68
 Even if the complaint were not otherwise fatally flawed, the allegations of selective enforcement of Hamilton's disciplinary rules are nonetheless insufficient. The undisputed facts are that Hamilton suspended all students, of whatever race, background or sexual orientation, who ignored the final warning notice to leave the building, and did not discipline any students who heeded that warning. See Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985) ("[I]t is important to note that Quarles was terminated along with his partner, who is a white man. In this setting, Quarles's allegations of discriminatory intent border on the frivolous."). It is preposterous to suggest that Hamilton's warnings to those occupying the building were not meant seriously until all of the white, non-ethnic, heterosexual offspring of Hamilton alumni vacated the building.
 
 
 69
 Plaintiffs also argue that Hamilton failed to respond to several incidents of alleged harassment of black students with appropriate disciplinary measures and thus selectively enforced its disciplinary rules when it suspended plaintiffs. However, the imposition of discipline by college administrators is highly fact-specific and discretionary. An inference of purposeful discrimination can be drawn only by comparing responses to similar acts of misconduct or patterns of discipline of students of different races over an ample period of time. The incidents alleged by plaintiffs allow neither comparison. For example, there is no allegation or evidence that college administrators knew who had harassed the black students or had sufficient evidence of hateful behavior to justify disciplinary action. On the other hand, plaintiffs' deliberate occupation of a building after repeated requests and warnings is conceded. The allegations also do not establish a pattern of discipline based on race.
 
 
 70
 Even if the alleged incidents of harassment would support a Section 1981 claim by black and Latin students for selective enforcement, the other students suspended may not piggyback on that claim. Whites are, of course, protected by Section 1981 for conduct that protects black persons exercising their rights under that statute. DeMatteis v. Eastman Kodak Co., 511 F.2d 306, modified on other grounds, 520 F.2d 409 (2d Cir.1975), held that a white plaintiff who alleged that he was fired for selling his home to a black person stated a claim under Section 1981. Such an action was necessary to vindicate the rights of blacks to contract freely. Similarly, in Fiedler v. Marumsco Christian School, 631 F.2d 1144 (4th Cir.1980), the Fourth Circuit held that white students who contested a school master's policy against interracial dating made out a cognizable Section 1981 claim. In the instant case, however, the other students were not punished for protecting the Section 1981 rights of black students. The non-black and non-Latin students certainly were not engaged in an anticipatory protest over the alleged selective enforcement of Hamilton's disciplinary rules. Instead, they were protesting Hamilton's failure to divest its holding in companies doing business in South Africa, its failure to establish an African-American Study Program and its "attitude" toward sexism and racism on campus. Section 1981 does not protect the rights of South Africans, regulate a college's "attitudes" or compel the adoption of a particular academic program.
 
 
 71
 I therefore dissent.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 On October 31, 1986, a group of about 70 students had entered Buttrick Hall and spent an hour "occupying" the vice-president's office, though our record does not indicate whether these students were disciplined in any way
 
 
 [2]
 By its terms the order restrained the named defendants and others from "congregating within the College's administrative building ... in such a manner as to disrupt or interfere with normal functions conducted by plaintiff in such place or to block, hinder, impede or interfere with ingress to or egress from" the building. The college claims, though the students deny, that their presence in the building interfered with normal operations of the building. It is difficult on this record to weigh the merits of this claim, however, as the college did not attempt to open its offices during the demonstration and there is no evidence of any actual disruption or misconduct by the students while they remained in Buttrick
 
 
 [3]
 These procedures include a quite detailed discussion of the hearing to be afforded the accused student. Among other things, the student is to be informed in writing of the charges, and has the right to retain student counsel, to call witnesses, and to cross-examine opposing witnesses. The penalties that the Board may impose, including suspension or expulsion, are also described in detail
 
 
 [4]
 Rule 4(b) requires the president or his agent to "offer a specific invitation to meet with the disrupters at some stated place and time in the immediate future for the purpose of constructive discussion."
 
 
 [5]
 Section 6450 provides, in relevant part:
 
 
 [1]
 The trustees or other governing board of every college chartered by the regents or incorporated by special act of the legislature shall adopt rules and regulations for the maintenance of public order on college campuses and other college property used for educational purposes and provide a program for the enforcement thereof.... Such rules and regulations shall govern the conduct of students, faculty and other staff as well as visitors and other licensees and invitees on such campuses and property. The penalties for violations of such rules and regulations shall be clearly set forth therein and shall include provisions for the ejection of a violator from such campus and property, in the case of a student or faculty violator his suspension, expulsion or other appropriate disciplinary action ... Such penalties shall be in addition to any penalty pursuant to the penal law or any other chapter to which a violator or organization may be subject. Such rules and regulations shall be filed with the regents and the commissioner of education not later than ninety days after the effective date of this act.... All amendments to such rules and regulations shall be filed with the regents and the commissioner of education not later than ten days after their adoption
 
 
 [2]
 If the trustees or other governing board of a college fails to file the rules and regulations within the time required by this section such college shall not be eligible to receive any state aid or assistance until such rules and regulations are duly filed
 
 
 [3]
 Nothing contained in this section is intended nor shall it be construed to limit or restrict the freedom of speech nor peaceful assembly
 
 
 [6]
 A preliminary question here would be whether the appellants have been deprived of any constitutionally protected rights by their suspension. Although the students' complaint does not specify which rights they claim to have been deprived of, we note that, at a minimum, the students' protected liberty interest is at stake because of the "stigma" attached to suspension from college for disciplinary reasons. See Goss v. Lopez, 419 U.S. 565, 574-76, 95 S.Ct. 729, 736-37, 42 L.Ed.2d 725 (1975); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445-46 (2d Cir.1980). We thus find it unnecessary to decide whether New York law gives the students a protected property interest in continuing at Hamilton
 
 
 [7]
 Part I of our dissenting brother's opinion goes to the merits of the appellants' procedural due process claim. These merits were not reached by the district court; they will be on remand
 Part II of Judge Winter's opinion rests on a reinterpretation of Coleman v. Wagner College. There this court held, as to "the factors to be explored on remand," the following, 429 F.2d at 1125:
 Most significant are the actions of the state officials with whom the rules and regulations are to be filed. If these officials were to regard their function as more than a ministerial task, and, as an illustration, believed themselves empowered to prevent regulations from being filed because of substantive "inadequacies," or exercised any other influence upon the content of regulations filed pursuant to section 6450, they would provide strong indicia of state action. Less obvious in its significance is the attitude of the college administrators required to draft regulations by the statute.... A reasonable and widespread belief among college administrators, however, that section 6450 required them to adopt a particular stance toward campus demonstrators would seem to justify a conclusion that the state intended for them to pursue that course of action. And this intent, if present, would provide a basis for a finding of state action. We discern several possible means of determining the attitude of college administrators toward the effect of the statute. The universal adoption of noticeably more stringent standards governing student disruption following the statute's enactment or an attempt by administrators to attribute the imposition of harsh penalties to the command of the state would give support to the conten tion that the statute constitutes significant state intervention in the area of campus discipline.
 As our opinion states, we find sufficient factual issues to avoid summary judgment on these issues; we do not decide it in favor of the appellants. See the first full paragraph on page 20 of the majority opinion.
 
 
 [1]
 Because the parties have not addressed whether these plaintiffs have a cognizable property interest, I limit my comments on this issue to a footnote. It is not clear that President Carovano's order suspending plaintiffs deprived them of "liberty or property" under the fourteenth amendment. The Supreme Court has emphasized that "[t]he hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " Logan v. Zimmerman Brush Co., 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 11, 98 S.Ct. 1554, 1561, 56 L.Ed.2d 30 (1978)); see also Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In order to demonstrate that their continued enrollment at Hamilton College constitutes such a property interest, appellants must show that under New York law, they could only be suspended for specified reasons. Yet, as appellants concede, under Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980), and under Article 78 of the New York Civil Practice Law and Rules, 78 Civ.Prac.L. & R. Secs. 7801-7806 (McKinney 1981 & Supp.1987), state law requires only that private colleges act in good faith and in accordance with their own regulations. New York law thus may not vest students with a property interest in private baccalaureate instruction
 Cases such as Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), which involved public educational institutions, are inapposite. Each of these cases involved "legitimate claims of entitlement" grounded in state law. Id. at 573, 95 S.Ct. at 735. In Goss, for example, the Supreme Court found that Ohio public high school students possessed protected property interests in their educations because Ohio law explicity "direct[ed] local authorities to provide a free education to all residents between five and 21 years of age." Id. (citing Ohio Rev.Code Ann. Secs. 3313.48, 3313.64 (1972 & Supp.1973)). In assuming that a constitutionally protected property interest is involved in this case, the parties here may have concluded that a finding that the suspension of plaintiffs was state action leads inexorably to the conclusion that Hamilton was "the state" when it had agreed to enroll them. The inquiries are entirely distinct, however. See, e.g., Memphis Light, 436 U.S. at 7 & n. 6, 9-12, 98 S.Ct. at 1559 & n. 6, 1560-61 (whether termination of utility service was state action and question of whether service was property interest are distinct issues).
 
 
 [2]
 The Guide states that: "The right of the President to decide finally on any student disciplinary matter is not precluded by the provisions outlined below."
 
 
 [3]
 We have recently held that asking a student occupying a building to leave and giving that student an opportunity to explain or justify his conduct meets the due process requirement for a pre-deprivation hearing in the case of a state university. Rosenfeld v. Ketter, 820 F.2d 38, 40 (2d Cir.1987)
 
 
 [4]
 Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980) held that once a college invokes its disciplinary code, the student involved may sue to compel the college to follow the procedures designated by the code. It cannot be sensibly read as requiring the college to resort to disicpline
 
 
 [5]
 Examination of the provisions governing suspension in effect at Hamilton College before enactment of Section 6450 clearly demonstrates that reliance upon Adickes and Peterson transforms this case from one about procedural due process to one involving the question of whether a private college may enforce a disciplinary code at all. At that time, Hamilton College's rules regarding suspension were as follows:
 Hamilton College reserves the right, at any time, to suspend for any period or to separate from the College any student whose academic performance or personal conduct, whether on or off the College campus, is, in the sole judgment of the College, unsatisfactory or detrimental to the best interests of the College without assigning any further reason therefor.
 No procedural protection at all was afforded. Section 6450, by encouraging a definition of offenses and a procedural code of enforcement, actually enhanced the protection of students from arbitrary action.