Michael HOLODNAK,
Plaintiff-Appellee,

v.

AVCO CORPORATION, AVCO–LYCOMING DIVISION, STRATFORD, CONNECTICUT, Defendant-Appellant.

No. 616, Docket 74–2381.

United States Court of Appeals,
Second Circuit.

Argued Jan. 28, 1975.

Decided Feb. 18, 1975.

Warren G. Sullivan, Greenwich, Conn. (Pullman, Comley, Bradley & Reeves,

Bridgeport, Conn., on the brief, Edward Maum Sheehy, Robert J. Cooney, Bridgeport, Conn., of counsel), for appellant.

Eugene N. Sosnoff, New Haven, Conn. (Sosnoff, Cooper & Whitney, New Haven, Conn., on the brief), for appellee.

Frank Cochran, Connecticut Civil Liberties Union Foundation, Inc., Hartford, Conn., as amicus curiae urging affirmance.

Before KAUFMAN, Chief Judge, and MANSFIELD and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Although several points with little merit are before us, in the main we are presented with two issues requiring decision: whether the Government has become sufficiently entangled in the actions of a private party to warrant a requirement that such conduct conform to constitutional standards of behavior; and whether punitive damages are available against a private party which has failed to measure up to those standards. Avco Corporation's Avco-Lycoming Division [Avco] has appealed from a judgment by Judge Lumbard vacating an arbitration award for partiality under 9 U.S.C. § 10 (1970), and granting Michael Holodnak back pay in the amount of $9,113.24, together with punitive damages of $10,000 and attorney's fees. We reverse the award of punitive damages; in all other respects we affirm.

I.

Michael Holodnak, a former employee of Avco at its Stratford, Connecticut plant and a member of Local 1010 of the United Auto Workers of America [the union], was discharged on May 29, 1969 after he published an article entitled *Building a Union Local* in the American Independent Movement [AIM] Newsletter. The article gave Holodnak's views on labor-management relations at Avco, and his opinion on the reasons unions lose their militancy. According to Avco, the statements made in the Newsletter violated Plant Conduct Rule 19, which

provided for the discharge or suspension of any employee

> [m]aking false, vicious and malicious statements concerning any employee or which affect the employee's relationship to his job, his supervisors or the company's products, property, reputation or goodwill in the community.

Local 1010 voted to refer the discharge to arbitration, and agreed to pay Edward Burstein, the union's attorney, to represent Holodnak.

At the hearing on July 17, 1969, before Burton Turkus, the permanent arbitrator under the agreement, Burstein met Holodnak for the first time, and then learned which rule Holodnak was accused of violating. During the arbitration proceeding, Turkus and the company representative seemed principally concerned with Holodnak's political views, and labored to convince him that the union's representation in the past had been effective. The arbitrator's one sentence unreasoned decision on November 22, 1969, cryptically stated that he found "just cause" for the discharge, as required by Article V, Section 1 of the collective bargaining agreement.

Holodnak then began this action against Avco and the union, seeking to vacate the arbitration award as well as to have himself reinstated, and to recover damages. After a careful review of the record of the hearing before Arbitrator Turkus, see Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577, 582 (2d Cir. 1967), Judge Lumbard concluded that the conduct of the arbitrator demonstrated evident partiality, and vacated the award pursuant to 9 U.S.C. § 10 (1970). He also found that the union had breached its duty of fair representation, and proceeded to consider Holodnak's claim for reinstatement and damages under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970). Noting that the business of the Stratford plant was almost exclusively confined to defense contracting, and that the United States not only owned nearly all the land, buildings, and equipment, but also generally supervised the manufacture of the products utilized by the Government, the judge found sufficient government involvement in Avco's operations to warrant first amendment protection for Holodnak's rights of speech and press. His dismissal for a proper exercise of those rights, Judge Lumbard held, violated the "just cause" provision of the collective bargaining agreement. He denied reinstatement,[1] but awarded Holodnak back pay in the amount of $9,113.24, together with attorney's fees,[2] and punitive damages of $10,000.

## II.

We are in agreement with the decision of Judge Lumbard to set aside the arbitration award, to deny reinstatement, and to award Holodnak back pay and counsel fees, and accordingly we affirm as to these issues on the basis of his thorough opinion. Holodnak v. Avco Corporation, Avco-Lycoming Division, Stratford, Conn., 381 F.Supp. 191 (D.Conn.1974). In light of the recent Supreme Court opinion in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), filed after Judge Lumbard's decision, however, it is necessary that we speak to the question of governmental action. For the reasons set forth below, we believe that the district court appropriately concluded that this issue is controlled by Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

---

1. Judge Lumbard denied reinstatement because he found that Holodnak's physical condition was such that it was doubtful he could perform the work he had formerly done. The court also concluded that Holodnak's failure to seek work during the years following his discharge cast doubt upon his willingness to return to his job at Avco.

2. The district court apportioned the liability for counsel fees between Avco and Holodnak's union, Local 1010, United Auto Workers of America. The union has paid its portion of the assessment, and does not appeal. Avco does not contest the computation of fees.

In Jackson v. Metropolitan Edison Co., *supra,* the Supreme Court decided that the conduct of the Pennsylvania Public Utilities Commission in regulating electrical utilities would not support a finding of state action in a company's failure to provide a hearing before termination of service. Metropolitan Edison, a privately owned and operated Pennsylvania corporation, held a certificate of public convenience which subjected it to extensive regulation by the Commission. Its general tariff, filed with the P.U.C., gave the company the right to discontinue service "on reasonable notice and to remove its equipment in the case of non-payment of bill . . .." Catherine Jackson's account was terminated pursuant to that provision.

Justice Rehnquist, writing for the Court, postulated that with regard to regulated utilities, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 95 S.Ct. at 453. Viewed from this perspective, the Court held, it was clear that Metropolitan's termination of service was not state action. In supplying electrical power, the utility was not exercising any function traditionally reserved to the state. And although the company had partial monopoly status, Justice Rehnquist stated that it may well have achieved that position through the economic forces of "high threshold capital requirements and virtually unlimited economy of scale," rather than by the state's intervention. *Id.* at n. 8. In any event, there was no evidence that the existence of competition would have assured Jackson an opportunity to contest the cut off in advance or otherwise avoid the interruption of service. *Cf.* Lucas v. Wisconsin Electric Power Co., 466 F.2d 638, 657 (7th Cir. 1972) (en banc), cert. denied, 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1974). Finally, the Court indicated that Pennsylvania's mere assumption of some regulatory powers by no means entailed an obligation to assert them to their fullest. *Cf.* H. J. Friendly, The Dartmouth College Case and the Public-Private Penumbra, 23 (1969). There was no evidence that the state approved, or even considered, the termination clause of the general tariff, and the mere fact of inaction was insufficient to invoke the protection of the Fourteenth Amendment. 95 S.Ct. 449.

Although *Jackson* stressed the failure to establish that Pennsylvania was directly involved in the challenged activities of Metropolitan—an emphasis which was far from novel, *see* Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968)—the Court took pains to stress that the absence of any proof of state initiation or enforcement would not necessarily be dispositive in all cases. It recognized the continued viability of the principle enunciated in Burton v. Wilmington Parking Authority, *supra,* 365 U.S. at 725, 81 S.Ct. 856, and *Moose Lodge, supra,* 407 U.S. at 172–173, 92 S.Ct. 1965, that where the state goes beyond mere regulation of private conduct, and becomes in effect a "partner" or "joint venturer" in the enterprise, the inference of state responsibility for the proscribed conduct could more easily be made. But Metropolitan Edison was a privately owned corporation which did not lease any facilities from the State of Pennsylvania, and remained solely responsible for the provision of power to its customers. In common with other corporations, it paid taxes to the state. Under such circumstances, the Supreme Court was of the view that there would be little reason to conclude that Pennsylvania's involvement in its affairs went beyond mere regulation.

The rationale for the difference in treatment alluded to in *Jackson* is well illustrated by Burton v. Wilmington Parking Authority, *supra,* where the private lessee of a restaurant in a state parking authority complex had engaged

in racial discrimination. Because the Parking Authority had "insinuated itself into a position of interdependence" with the restaurant in carrying out its accepted governmental responsibilities, it had an obvious interest in the permissibility of the challenged activity. Thus, for example, the Court emphasized that "profits earned by [the restaurant's] discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." 365 U.S. at 724, 81 S.Ct. at 861. Moreover, unlike the case where an agency has merely engaged in regulatory activity to control private enterprise in default of market forces, entry of the state itself into the field places "its power, property and prestige" behind challenged activities of the private partner. *Id.* at 725, 81 S.Ct. at 856. To fail to recognize state action in the latter situation would, in many cases, permit the Government to endorse and encourage conduct in which it could not itself permissibly engage. Finally, it is undeniable that mere governmental inaction takes on a new significance in the *Burton* context. *Compare* Jackson v. Metropolitan Edison Co., 95 S.Ct. at 457 ("the Commission's failure to overturn this practice amounted to no more than a determination that a . . . utility was authorized to employ such a practice if it so desired"), *with* Burton v. Wilmington Parking Authority, 365 U.S. at 725, 81 S.Ct. at 862 ("in its lease . . . the Authority could have affirmatively required [the restaurant] to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. . . By its inaction, the Authority, and through it the State, has . . . made itself a party to the refusal of service").

█ Even a cursory perusal of the facts in this case indicates that the government involvement in Avco's operations typified the "symbiotic relationship," 95 S.Ct. 449, which the Court failed to find in *Jackson*. The testimony of General Beverly Warren, Avco vice president in charge of operations at the Stratford facility established that "by far the large proportion" of the work done at the plant at the time of Holodnak's discharge was performed under contract for the Department of Defense, the Army, Navy, and Air Force. The major part of that business was the manufacturing of two models of gas turbine engines used in army helicopters, although the Stratford division also built nose cones for minuteman missiles, and constant speed drives employed in Navy fighter planes. And the entire 77 acres on which the plant was built, as well as the numerous buildings and other structures, were owned by the United States. Moreover, General Warren stated that "most of the machinery and equipment used in the manufacturing process" was also owned by the Government, and Avco paid no rent for the use of land, buildings, and machinery, although some deduction for their use was made under "awaited guidelines" upon negotiation of contracts. Goods manufactured at the Stratford facility were delivered to the United States at the plant, and shipped under government bills of lading. In addition, a substantial government "task force" maintained at the plant undertook to assure contract compliance, to guarantee control of product quality, and to audit the accounting activities of the Stratford facility.

Under these circumstances, we find compelling reasons to conclude that the Government "has so far insinuated itself into a position of interdependence with [Avco] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been . . . 'purely private' . . .." *Burton, supra,* at 725, 81 S.Ct. at 862. The enterprise to which the Government contributed land, buildings, and equipment, and for which Avco supplied the labor force, was operated for their mutual benefit—Avco's financial growth, and the Government's constitutional interest in raising and supporting an Army, and providing and maintaining a Navy. U.S. Const. Art. I,

§ 8, cls. 12, 13. Nor is it irrelevant, particularly in view of the significance of the Vietnam war as it was perceived in 1969,[3] that each had an overriding interest in avoiding the interruption of production through any sort of labor unrest. *Cf. Burton, supra*, at 724, 81 S.Ct. 856. Coupled with the extensive commitment of "power, property and prestige," these factors are sufficient to sustain a finding of governmental action.[4]

■ To resolve the question of government involvement, however, is merely to frame the issue. For although the courts have treated state participation in matters of discrimination with uncompromising rigor, the absoluteness of many other constitutional guarantees has been tempered by a judicious regard for other conflicting and often significant concerns. *Wahba v. New York University*, 492 F.2d 96, 100 (2d Cir. 1974). And notwithstanding the strict scrutiny due any attempt to limit our precious right of free speech, *Russo v. Central School District No. 1*, 469 F.2d 623, 624 (2d Cir. 1972), we are constrained to recognize that even the Government

> has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the . . . citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). With regard to Holodnak's article, however, that balance tips decidedly in favor of protection.

Given that the crucial interest held by both the Government and Avco in this case was averting labor unrest, it is important to note that the AIM Newsletter for which Holodnak wrote had a circulation of only 750 copies, and was sold primarily on newsstands in New Haven. some 20 miles from Stratford.[5] The evidence adduced at trial established that it had been shown to only a dozen of Avco's 8000 employees before publication, and to none thereafter. Nor can we consider the language used as capable of evoking a response more inflamed than discussion. Despite Avco's suggestion that the article favored wildcat strikes, it is clear that Holodnak questioned their effectiveness rather than advocated them. We also agree with Judge Lumbard, "that use of vituperatives alone, such as at issue here, could not have interfered with production at Avco." 381 F.Supp. at 203. Finally, it is clear that with respect to defamatory statements, the holding in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), has no application, since Holodnak did not even identify those who he believed had scuttled the interests of the Avco employees.[6]

---

3. *See, e. g.*, United States v. Avco Corp., Lycoming Division, Stratford, Conn., 270 F.Supp. 665, 670 (D.Conn.1967) (continuation of a strike at Avco's plant "would imperil the national safety").

4. We find unconvincing the argument that the extent of government involvement should be weighed against the entire range of activities of the Avco conglomerate, and not merely seen in the context of the Stratford's plant. There is little reason to suppose that the impact of government participation in defense contracting is attenuated by the fact that the Avco Corporation conducts substantial commercial operations as well.

5. Some of the 750 copies of the Newsletter were sold through mail subscriptions. The record does not indicate clearly how Avco obtained a copy of Holodnak's article, although a Newsletter staff member testified that Avco "may have been" on the mail subscription list.

6. It is true, as Avco suggests, that by the time the article was written Burton Turkus had been appointed the permanent arbitrator under the collective bargaining agreement. But we find it difficult to characterize as defamatory of an individual the over-broad and thus hardly believable statement that "the biased judges and arbitrators, for all practical purposes, belong to the company."

## III.

In addition to awarding back pay and attorney's fees, the district court found that

[s]ince Avco has acted wilfully in a manner that violated Holodnak's constitutional and statutory rights, punitive damages are available

381 F.Supp. at 206. The grant of exemplary damages was bottomed on the finding that Holodnak had been discharged for exercising rights protected by the first amendment and, apparently, by the National Labor Relations Act, § 7, 29 U.S.C. § 157 (1970). Judge Lumbard concluded that such an award was proper in a § 301 action for breach of the collective bargaining agreement, pursuant to the more general principle of contract law that "punitive damages are available when the defendant's actions might also be tortious." 381 F.Supp. at 205. See, e. g., 5 Corbin, Contracts § 1077 (1964). The unusual circumstances presented by this case cause us to disagree. Accordingly, we reverse the award of punitive damages in the sum of $10,000.

We note preliminarily that insofar as the judge found a justification for punitive damages in Avco's violation of a right protected by the federal labor laws, he reached a conclusion which he had earlier—properly, we think—held himself without authority to draw. In discussing the restrictions which the company might permissibly impose on Holodnak's right of free speech, the court noted that

even in private enterprise where the guarantees of the First Amendment do not apply, federal statutes have given employees the right to speak their minds on labor relations. [*Citing* § 7 of the National Labor Relations Act, 29 U.S.C. § 157.] . . . Interference with these rights by an employer is an unfair labor practice. 29 U.S.C. § 158(a)(1) . . . Of course, the question of whether Holodnak's discharge is an unfair labor prac-

tice is not for a district court to decide.

381 F.Supp. 203. Such a determination is, of course, a matter for the National Labor Relations Board in the first instance. *Cf.* NLRB v. Magnavox Co., 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). Thus, although the court below correctly avoided basing compensatory damages upon a violation of the labor laws, it failed to do so in its award of punitive damages.

The grant of exemplary damages for Avco's violation of Holodnak's statutory right was improper for another reason. The district court expressly found that "there is no evidence that punitive damages are necessary to deter future violations by Avco." 381 F.Supp. at 205. Its award rested not on any notion that such a penalty would further purposes embodied in the federal labor laws, but rather on the fact that Holodnak's right of free expression had been willfully violated. Insofar as that right derives from § 7 of the Act, however, there is a significant difference between this case, and one in which a breach of contract also constitutes a wrong under more traditional notions of tort law. For although the remedies available to vindicate Holodnak's right are not entirely defined by the Act itself, it is at least true that any judicial enforcement of that right must "look . . . at the policy of the legislation and fashion . . . a remedy that will effectuate that policy." Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Where Holodnak has been fully compensated for any damage he sustained as a result of the violation, and where there has been an explicit finding that punitive damages are unnecessary to deter any future contravention, we are of the view that a greater exaction from Avco would not further any policy embodied in the Act.

But our inquiry does not end here, for the district court's award of exemplary damages was based not merely on a violation of Holodnak's rights under the

federal labor laws, but also on a finding that Avco had abridged his rights under the First Amendment. This justification must fail as well.

We begin once again by noting that, in finding that Holodnak was entitled to an award of damages for a breach of his constitutional rights, Judge Lumbard was forced to confront an issue which, as his opinion makes clear, he had hoped to avoid. In awarding Holodnak compensatory damages for Avco's breach of the "just cause" provision of the collective bargaining agreement, the court noted that it was unnecessary to determine the difficult "issue of whether the rationale of Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which allowed damage actions to remedy violations of the Fourth Amendment, extends to actions charging violations of the First Amendment." 381 F.Supp. at 204 n.12. By concluding that the first amendment violation entitled Holodnak to recover punitive damages, however, the judge *sub silentio* resolved that very issue in the affirmative. We find it unnecessary to decide that open question, see *Bivens, supra*, 403 U.S. at 409 n. 9, 91 S.Ct. 1999 (Harlan, J., concurring); Wahba v. New York University, 492 F.2d 96, 103–04 (2d Cir. 1974), however, as well as the more difficult issue whether *Bivens* in appropriate cases will authorize the award of punitive as well as compensatory damages, see *Bivens, supra*, 403 U.S. at 397, 91 S.Ct. at 2005 ("we hold that petitioner is entitled to recover money damages *for any injuries he has suffered* as a result of the agents' violation of the Amendment" [emphasis added]), since we conclude that in any event exemplary damages are not available against a private party in the *sui generis* circumstances before us.

█ In holding that compensatory damages were available against govern-

ment agents for a violation of fourth amendment rights, the *Bivens* Court was careful to stress the unique abuses of federal authority which distinguished such violations from common law notions of trespass and invasion of privacy. 403 U.S. at 392, 394, 91 S.Ct. 1999. Such considerations are at least equally germane to a consideration of first amendment violations, which often have little in common with the conduct protected by traditional tort law against interference by private individuals. Thus, for example, it is black letter law that purely private restrictions on the right of free speech are not prohibited in many circumstances where the First Amendment would forbid similar interference by the Government.

█ Of course, when a private party becomes too closely intertwined with governmental authority it may appropriately be enjoined, Burton v. Wilmington Parking Authority, *supra*, since the difficulty of separating private from governmental action for remedial purposes would often preclude any effective relief. And where, as in this case, a private party has contractually assumed an obligation to observe the constitutionally protected interests of another, a violation of that independent obligation may be the subject of an action for compensatory damages.[7]

█ Historically, however, punitive damages have been awarded in contract cases only where the conduct complained of constitutes a willful abuse of a duty imposed as a result of the defendant's position of authority or trust, as well as a breach of contract. *See, e. g.,* Brown v. Coates, 102 U.S.App.D.C. 300, 253 F.2d 36, 39–40 (1958) (breach of trust by broker acting as agent); 5 Corbin, Contracts § 1077 at 444 (1964) (abuse of monopoly position by public service company); Southwestern Gas & Elec. Co. v. Stanley, 45 S.W.2d 671 (Tex.Civ.App.1931); Har-

---

**7.** It goes without saying that, where a nominally private party has been allowed to exercise powers traditionally reserved to the Government itself, it will no longer be treated for remedial purposes as a "private party."

*See, e. g.,* Marsh v. Alabama, 327 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park).

baugh v. Citizens' Telephone Co., 190 Mich. 421, 157 N.W. 32 (1916); Davis v. Atlantic Coastline R. Co., 104 S.C. 63, 88 S.E. 273 (1916); Carmichael v. Bell Telephone Co., 157 N.C. 21, 72 S.E. 619 (1911). And although the first amendment imposes precisely such a duty on governmental agents, because of both the power with which they are invested and the unique temptations to abuse it, such is not the case with those—like Avco—whose constitutional obligations derive, so to speak, from the company they keep. It is true, as we have noted, that in dismissing Holodnak for his exercise of first amendment rights Avco violated the "just cause" provision of its collective bargaining agreement, and thereby opened itself to liability for the foreseeable harm which Holodnak suffered. But we are unable to conclude that Avco's action, as much as we deplore it, was a willful abuse of the governmental power which the first amendment seeks to restrain.

The award of punitive damages is reversed. In all other respects we affirm.