**Joyce ATKINSON, Plaintiff,**

v.

**B.C.C. ASSOCIATES, INC., Defendant.**

**No. 91 Civ. 4443 (MBM).**

United States District Court,
S.D. New York.

Aug. 12, 1993.

Michael S. Lazan, Arnold S. Cohen, Christopher Callagy, Bronx Legal Services, Bronx, NY, for plaintiff.

Carter K. Combe, Andrew P. Marks, Roberts & Finger, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff sues under 42 U.S.C. § 1983, alleging that defendant, her former employer, violated her constitutional rights when it fired her in March 1990 after she tested positive for cocaine use during a random urinalysis. Plaintiff and defendant both move for summary judgment. For the reasons stated below, plaintiff's motion is denied, defendant's motion is granted, and the case is dismissed.

### I.

Defendant B.C.C. Associates, Inc. ("BCC") is a 60–employee private corporation headquartered in Brookfield, Connecticut. (Def. Rule 3(g) Statement ¶ 1; S. Conant Decl., Ex. 1 & Dep. at 13–14) BCC is a family business: Barton Conant is its sole owner and manager; two of his sons, Scott and James, are vice presidents; and several other family members are employees. (B. Conant Dep. at 1–12) BCC counts money for the Triborough Bridge and Tunnel Authority ("TBTA"), a public agency, at TBTA's Randall's Island Processing Center ("RIPC"). (Def. Rule 3(g) Statement ¶ 3)

TBTA collects toll receipts from bridges and tunnels in the New York City area. Before 1984, TBTA contracted with local banks to count its receipts. (S. Conant Dep. at 18–19) Until late 1983, Barton and Scott Conant worked at Abbott Systems, Inc., another private company which advised TBTA about problems related to money counting. (B. Conant Dep. at 8–13) In late 1983, the Conants left Abbott, formed BCC, and, with Abbott's consent, also began advising TBTA, on a trial basis. (*Id.* at 14; S. Conant Dep. at 6–10, 14–15)

In early 1984, BCC sought to replace the private banks that were counting TBTA's receipts, and submitted a proposed procedures manual to TBTA. (S. Conant Dep. at 152–156) After negotiations, on June 28, 1985, BCC and TBTA entered into a written contract (the "Contract") for BCC to count TBTA's receipts until 1992. (S. Conant Decl., Ex. 3) After a competitive bid, the Contract was renewed in 1992. (Conant Decl., Ex. 7)

The Contract provided, among other things, that BCC would be liable for any negligent loss of TBTA funds and property. (Lazan Aff., Ex. E, ¶ 4) In addition, the Contract provided that:

E. The Company [BCC] shall periodically check the work performed by its employees to ensure that the counting equipment is in good order and that the money is being counted and reported accurately. The records to be prepared by the Company and the procedures for counting the money and tokens are set forth in Appendix A which is made a part of this agreement.

F. The Company shall provide adequate supervision to insure a constant test of integrity for all aspects of the assigned responsibilities....

(*Id.*) The "procedures" referred to above were set forth in Appendix A to the Contract:

*3. BCC Associates—Rights and Privileges*

—BCC Associates retains the right to dismiss any employee with or without cause at its own initiative, or at the request of Triborough Bridge and Tunnel Authori-

ty. Information received from any safeguard testing or procedure *may* also be cause for dismissal.

—Video Surveillance, periodic pre-counting of receipts, poligraphy [*sic* ], urinalysis, personal search, metal detection devices, long and short term statistical analysis, medical testing, and background research *may* all be used by BCC Associates to monitor performance and compliance, and *may* be used as cause for dismissal.

(Lazan Aff., Ex. E at # 226) (emphasis added)

Plaintiff Joyce Atkinson worked for BCC at the RIPC from June 1989 until March 1990. (Pl. Dep. at 53–55) Plaintiff's job consisted of counting, with the assistance of a machine, TBTA's daily toll receipts. (*Id.* at 62–65) TBTA played no role in hiring plaintiff. (S. Conant Dep. at 434)

Plaintiff testified that, at her initial job interview, BCC informed her that "there would be random drug tests." (Pl. Dep. at 73) Later, she signed an agreement consenting to such tests. (S. Conant Decl., Ex. 8) In March 1990, ten BCC employees, including plaintiff, tested positive for cocaine, and all were dismissed. (Pl. Dep. at 94; S. Conant Dep. at 446)

Plaintiff filed her complaint on April 29, 1992.[1] Plaintiff claims that BCC violated her rights under Fourth and Fourteenth Amendments of the United States Constitution, and under Article I, Sections VI and XII of the New York State Constitution. (Pl. Mem. at 2) Specifically, plaintiff claims that BCC violated her Fourth Amendment rights when "acting under color of state law, [BCC] terminated Plaintiff after subjecting her to a random drug test without individualized, reasonable suspicion that she had engaged in illegal drug use." (Compl. ¶ 44) Plaintiff claims also that BCC violated her due process rights under the Fourteenth Amendment because

acting under color of state law, [BCC] failed to provide Plaintiff with an opportunity to be heard before placing false, stigmatizing references pertaining to drug use in her employment record that have been and likely will be disseminated to potential employers and has hindered and will, in the future, hinder Plaintiff's ability to obtain employment.

(Compl. ¶ 45)

Plaintiff and defendant both move for summary judgment. Defendant BCC argues that it is entitled to summary judgment, because BCC is a private entity not engaged in state action, and therefore did not act "under color of state law" when it fired plaintiff.

■ Fed.R.Civ.P. 56(c) requires a summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

■ However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to

---

1. Originally, plaintiff sued in New York State Supreme Court. Defendant removed the case to this Court, and plaintiff's motion to remand the case to state court was denied on March 9, 1991. On November 13, 1992 plaintiff voluntarily dismissed, with prejudice, her claims of unlawful disability discrimination under the New York Human Rights Law, N.Y.Exec.Law §§ 292(21), 296(1) (McKinney 1992). (Combe Aff., Ex. A)

materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

For the reasons stated below, there is no genuine issue of fact as to whether BCC acted "under color of state law" when it fired plaintiff; it did not.[2] Accordingly, defendant's motion for summary judgment is granted.

## II.

Whether "state action" exists here depends, as a preliminary matter, on the meaning of the Contract and the extent of TBTA's involvement in the business of BCC. Plaintiff claims that TBTA required BCC to test for drug use, because the Contract "requires defendant to perform urine tests of its employees for drugs." (Pl. Mem. at 5) BCC denies that TBTA had any role in such testing, and argues that BCC was free to decide whether and how to test. As explained below, there is no genuine issue of fact as to whether BCC was obligated by TBTA to test its employees for drug use; it was not.

Plaintiff is correct that, as a general matter, TBTA is closely tied to BCC. Plaintiff claims, and defendant admits, the following facts: BCC performs the Contract at a TBTA–owned building; TBTA owns much of the equipment BCC uses—although much of it was developed by and purchased from BCC (S. Conant Dep. at 15–17); TBTA pays BCC's maintenance costs, and telephone and electric bills; TBTA monitors and investigates BCC's employees, and uses video cameras and metal detectors to protect against theft; and several TBTA representatives are present at BCC for a few hours every business day. (Pl. Rule 3(g) Statement & Def. Response ¶¶ 16–20, 23–26) Moreover, defendant admits that TBTA has been BCC's principal client, although defendant has sold equipment to and advised other clients on occasion. (S. Conant Dep. at 64–66, 509, 514; Def. Mem. at 7 n. 5)

However, despite these close ties, there is no evidence that TBTA had a role in BCC's drug testing program, or in the particular test that led to plaintiff's dismissal. (B. Conant Dep. at 42) First, the conduct of both TBTA and BCC shows that BCC was not obligated to test for drug use. TBTA did not request or suggest that BCC test its employees for drug use prior to BCC's proposal in 1984. (B. Conant Dep. at 17–26; S. Conant Dep. at 12–13, 22–27) TBTA's only previous involvement in drug testing at BCC was when it volunteered to help BCC with testing in 1985. (*Id.* at 37–38) Although TBTA assisted in the administration of drug tests before plaintiff was hired, TBTA had no role at all in that activity while plaintiff was employed at BCC. (B. Conant Dep. at 36–41; S. Conant Dep. at 82, 101). BCC has never dismissed or taken disciplinary action against an employee at TBTA's request. (S. Conant Dep. at 423–24)

Moreover, before plaintiff was hired BCC made at least one personnel decision in response to drug test results which was in direct conflict with TBTA's expressed preference. In that instance, several BCC employees tested positive for marijuana use. (B. Conant Dep. at 28–29, 40–41, 86–87) TBTA asked BCC to fire those employees, but BCC refused. (*Id.* at 28–29, 41)

---

**2.** There are several disputed fact issues which are relevant to this case generally, but not to the state action issue. For example, plaintiff passed the first drug test, and claims that she also passed a second test, although defendant's records do not indicate a second test. (Pl. Dep. at 85–92; Def. Mem. at 19 n. 13) Plaintiff challenges the accuracy of the positive test result on various grounds—*e.g.*, she spilled urine on her hands, the sample was not sealed, her prescription medicines cross-reacted, the hospital center was not certified (Pl. Dep. at 94–95, 100, 120– 121; Lazan Aff., Ex. T)—none of which is the basis for this decision. At her first deposition session, plaintiff testified that she had never used illegal drugs; after BCC compelled production of hospital records, she admitted at a second deposition session that she was a former intravenous heroin user. (Pl. Dep. at 144) Finally, it appears that after plaintiff was fired, BCC did not communicate with any potential employer of plaintiff, and plaintiff found a new full-time job in June 1990, three months after BCC dismissed her. (Pl. Dep. at 18–22)

There is no evidence that TBTA had a role in BCC's personnel decisions generally. When TBTA asked BCC to fire an employee with a police record, BCC again refused. (S. Conant Dep. at 119–20) There is no evidence that BCC ever has dismissed or disciplined an employee at TBTA's request. (*Id.* at 423–24) Plaintiff admits that BCC stopped its random drug testing program after plaintiff filed suit. (Pl. Mem. at 10 n. 4; S. Conant Dep. at 104) Plaintiff's criticism that BCC's preemployment testing was not "conscientiously implemented" (Pl. Mem. at 10 n. 4) further suggests that BCC controlled its drug testing, and was not obligated by TBTA to test.

Second, conversations between officials of TBTA and BCC do not reveal an obligation to test. It appears that officials of TBTA and BCC discussed the issue of drug testing generally. (Pl. Rule 3(g) Statement ¶¶ 6–8; Pl. Mem. at 2–4) In fact, defendant does not dispute that such discussions occurred. However, there is no evidence that BCC and TBTA reached any agreement or understanding with respect to drug testing, other than the one memorialized in the Contract. Moreover, there is no suggestion that TBTA initiated such conversations. Barton Conant testified that: "Really, it wasn't a discussion. It was just people in the industry know that if people are on drugs, they tend to steal money." (B. Conant Dep. at 19)

For example, plaintiff argues that Arnold Lovecchio, a management official at TBTA, who plaintiff stresses is a "law and order" type (Pl. Mem. at 8), "understood" that BCC would test its employees for drug use. (Pl. Mem. at 4) Plaintiff asserts that "TBTA has made it clear that it wants defendant to be very tough on persons who test positive for drugs." (Pl. Mem. at 8)

Plaintiff argues strenuously that such conversations about drug testing are evidence of BCC's obligation to test. However, even if those conversations are evidence that BCC and TBTA agreed that drug testing was useful, the facts in this case show that BCC was a private money-counting business with security concerns, and that, at least according to Barton Conant, "if you are in the money-counting business, you know that

[drug testing] is an appropriate procedure to use." (B. Conant Dep. at 31–32) Protection against theft is especially important to BCC, because BCC is liable for any shortfall between its count and TBTA's independent audit. (Lazan Aff., Ex. E, ¶ 4A) Consequently, it is not probative of TBTA control that such conversations occurred; nor is it irrelevant to BCC's own interest that BCC decided to test its employees for drug use, even though it was not required by TBTA to test.

Conversations about the wisdom of drug testing do not suggest that BCC was obligated by TBTA to test for drug use. The most the conversations can suggest is that BCC and TBTA "agreed that it was a good idea to test for drugs." (B. Conant Dep. at 20, 25, 31–32) Plaintiff claims that Barton Conant "knew" that TBTA tested its own employees for drugs. (B. Conant Dep. at 32) Barton Conant speculated that TBTA "knew all along we were drug testing our employees." (*Id.* at 103) However, when plaintiff's counsel pressured Barton Conant to admit that TBTA intended to require drug testing, he responded "I think I have answered that about fourteen times ... I have no idea what Arnold Lovecchio [a TBTA officer] was thinking." (B. Conant Dep. at 34) Scott Conant testified that "I recall they [TBTA] said if you want to go ahead and continue doing it [drug testing], go ahead. They didn't say you must continue or you should continue. Nothing of that nature." (S. Conant Dep. at 414) Instead, Scott Conant referred to the Contract which stated that a positive drug test "*may*" be cause for dismissal." (*Id.* at 423) (emphasis added) In sum, these conversations are not evidence that BCC was required to test; according to the Contract, testing was BCC's option.

Finally, plaintiff attempts, more cleverly than astutely, to manufacture a "requirement" of drug testing from isolated portions of deposition testimony by Barton and Scott Conant. At several points in those depositions, plaintiff's counsel elicited responses which, ripped from context, might suggest that Barton Conant thought BCC was required by TBTA to test employees for drug use. For example, plaintiff claims Barton Conant testified that paragraph 4F of the

Contract—which provides that BCC "shall provide adequate supervision to insure a constant test of integrity," (Lazan Aff., Ex. E at 4) but does not mention drug testing—nevertheless includes drug testing. (Pl. Mem. at 6; B. Conant Dep. at 63) However, Barton Conant's *full* testimony is not that BCC was obligated to TBTA to test for drug use; rather, he testified that "[t]here was an appendix to this contract that covered all of the procedures that we agreed would be followed that was based on our proposal." (B. Conant Dep. at 63) At one point, Barton Conant referred to drug testing as an "accepted procedure" and the following exchange occurred:

Q. What do you mean "accepted procedure"?

A. It was part of the procedure that we, as a contractor, were obligated to perform.

Q. Pursuant to the contract?

A. Yes.

(B. Conant Dep. at 47) Plaintiff cannot bootstrap this "admission" that BCC was "obligated to perform" into an actual contractual obligation to test. Notwithstanding plaintiff's ability to manipulate the Conants' deposition testimony, there is one aspect of this case plaintiff cannot vary: the plain language of the Contract. The Contract contains no drug testing requirement. In contrast, the Contract provides that it is up to BCC to decide whether to test for drug use, and if BCC tests it is also up to BCC to decide whether to dismiss an employee who tests positive. (Lazan Aff., Ex. E at # 226) The Contract says "may," not "shall." (*Id.*) Conclusory snippets of testimony cannot be read to change that meaning unless there is evidence of conversations or other exchanges between BCC and TBTA to show that actual practice differed from the meaning of Contract. As discussed above, the evidence shows that practice was consistent with the language of the Contract.

Based on the above facts, BCC was not obligated by TBTA to test its employees for drug use.

3. Plaintiff's arguments under the so-called "joint participation" test are addressed in the first two sections, below.

### III.

An action under 42 U.S.C. § 1983 cannot be maintained unless the challenged conduct was attributable at least in part to a person acting under color of state law. *See Chan v. City of New York*, 1 F.3d 96, 106 (2d Cir.1993) (citing *Rendell–Baker v. Kohn*, 457 U.S. 830, 835, 102 S.Ct. 2764, 2768, 73 L.Ed.2d 418 (1982) and *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993)). The courts employ various tests to determine whether "the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *see Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1081 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991) ("symbiotic relationship" and "close nexus" tests); *Albert v. Carovano*, 824 F.2d 1333, 1338 (2d Cir.1987) ("state compulsion" test); *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 384–85 (2d Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981) ("public function," "symbiotic relationship," and "close nexus" tests). The Second Circuit has noted that under any of "the various tests," the determination of when a private party can be characterized as a "state actor" is "necessarily [a] fact-bound inquiry." *Albert v. Carovano*, 824 F.2d at 1340 (citing cases).

Under any of the applicable tests,[3] the undisputed facts show that BCC did not act "under color of state law." As found above, there is no genuine issue of fact as to whether BCC was obligated by TBTA to test for drug use. BCC is a private company performing work for a public agency, and BCC's voluntary decisions to test plaintiff for drug use and then fire her do not qualify as state action under any of the tests.

### A.

*Symbiotic Relationship*

According to the "symbiotic relationship" test, state action should be found where

"the state has so far insinuated itself into a position of interdependence . . . that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). This test focuses on the state's over-all relationship with the private actor. *See Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1082. For example, in *Burton*, the Supreme Court held that discrimination by a private restaurant located in a publicly-owned parking building was state action where the building was "dedicated to 'public uses' in performance of [the Parking Authority's] 'essential governmental functions,' " the restaurant was operated as an integral part of the public building devoted to a public use and sharing profits with the municipal authority, and the rent was paid to the state. *Burton*, 365 U.S. at 723–24, 81 S.Ct. at 860–61.

Plaintiff argues that TBTA and BCC have a symbiotic relationship because, among other things, (1) BCC receives from TBTA certain subsidies—rent, equipment, repairs, and security; (2) BCC depends on TBTA as its only significant client; and (3) TBTA has a "considerable amount of impact on how defendant treats its personnel." (Pl. Mem. at 51) Plaintiff relies on *Burton, supra*, and *Holodnak v. Avco Corp.*, 514 F.2d 285 (2d Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975), in which the Second Circuit held that a defense contractor which fired an employee was a state actor.

■ At the outset, plaintiff has not shown that TBTA has a "considerable amount of impact" on how BCC conducts its drug testing. In contrast, as stated above, the undisputed facts show that TBTA had no impact at all. Therefore, plaintiff's argument is simply that BCC and TBTA have a symbiotic relationship because TBTA subsidizes BCC and is BCC's only major client.

The Supreme Court has held that the acts of private companies "do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell–Baker v. Kohn*, 457 U.S. at 841, 102 S.Ct. at 2771. In *Rendell–Baker*, the Supreme Court found that there was no state action because, despite defendant's connections to the government, defendant was a private school free to make its own personnel decisions. "[T]he provision of services to a state entity does not establish state control, even where, as here, the private contractor's sole business is the performance of public contracts." *Rodriguez–Garcia v. Davila*, 904 F.2d 90, 97 (1st Cir.1990) (citing *Rendell–Baker v. Kohn*, 457 U.S. at 841, 102 S.Ct. at 2771). Nor does not receipt of state subsidies justify a conclusion of state control. *Rodriguez–Garcia v. Davila*, 904 F.2d at 97 (citing cases). In other words, the test is "whether the government exercised coercive power or provided such significant encouragement that the choice to fire [plaintiff] must be deemed to be that of the government." *Id.* (citing cases). There is no evidence that such power was exercised or such encouragement given.

Moreover, there is no doubt here that BCC is a private entity. The Court in *Burton*, noted that whether an entity is private or public depends on its structure and relationship to the governmental unit. *Burton*, 365 U.S. at 724, 81 S.Ct. at 861. BCC does not operate in a public setting in the sense of dealing with the public, and does not perform a public activity. Although the RIPC, where BCC operates, is a government-owned building, it is not a public accommodation such as the restaurant in the municipal parking garage in *Burton*. Neither is BCC engaged in the kind of public activity as the defense contractor in *Holodnak v. Avco, supra*. Several courts have held that private conduct by a private entity is not state action, even when the entity is closely related to the state. *See Thomas v. Cannon*, 751 F.Supp. 765, 768 (N.D.Ill.1990) (private company under contract with Chicago Transit Authority to provide transportation services not a state actor); *Mineo v. Transp. Mgt. of Tennessee, Inc.*, 694 F.Supp. 417, 419, 424 (M.D.Tenn. 1988) (no symbiotic relationship even though private company's "sole function . . . was to manage and operate Nashville's transit system" and even though government supplied company with "equipment, office space, furniture and supplies"); *Boudette v. Arizona Public Serv. Co.*, 685 F.Supp. 210, 213 (D.Ariz.1988) (privately-owned public utility

corporation which leased facilities from state was not state actor when it terminated plaintiff's electricity, because state did not profit from challenged conduct and was not financially "integrated" with defendant).

■ One rationale behind the "symbiotic relationship" test is that a governmental entity cannot escape liability by delegating to another party responsibility for an essentially public function. *See Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Burton, supra.* Therefore, one of the key factors, although not the only factor, in determining whether a "symbiotic relationship" existed is whether the state shared in any profits, and there is no suggestion that TBTA did. *See Rendell–Baker*, 457 U.S. at 843, 102 S.Ct. at 2772; *Boudette v. Arizona Public Serv. Co.*, 685 F.Supp. at 213 (factors include "whether the state profits from the challenged conduct; whether the state and the defendant are financially 'integrated'; whether the defendant company is privately owned; and whether the defendant leases its facilities from the state") (citing cases).

Moreover, "[w]here one starts with an admittedly private institution the question is not what tests show its actions are not attributable to the state, but, rather, what shows they are attributable." *Johnson v. Pinkerton Academy*, 861 F.2d 335, 337 (1st Cir. 1988). Therefore, plaintiff here has the burden of showing "the State is *responsible* for the specific conduct of which the plaintiff complains," *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (emphasis in original), a burden which plaintiff has not met. To qualify as state action, the conduct in question

> 'must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and 'the party charged with the [conduct] must be a person who may fairly be said to be a state actor.'

*United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1296 (2d Cir.1991) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. at 937, 102 S.Ct. at 2753); *see also LeBlanc–Sternberg v. Fletcher*, 781 F.Supp. 261, 268 (S.D.N.Y.

1991). Plaintiff has not shown that BCC's conduct was attributable to TBTA.

Finally, plaintiff's reliance on *Holodnak v. Avco Corp., supra,* is misplaced. In *Holodnak,* the Court found that the defendant was engaged in state action when it violated the First Amendment rights of an employee by firing him for writing a magazine article critical of the company's labor relations. *Holodnak,* 514 F.2d at 289–90. All the land and most of the buildings and equipment used by the defendant, a defense contractor, were government-owned, and the majority of work at defendant's plant was under government contract, involving the construction of defense-related equipment. *Holodnak,* 514 F.2d at 289.

*Holodnak* is distinguishable from this case in at least three ways: (1) the defendant employer was engaged in a core function of the federal government, defense; (2) the defendant's activity occurred during a war, the Vietnam War; and (3) the level of government supervision was greater. In contrast, BCC was not engaged in a core function of the government—in fact, private banks previously had counted TBTA receipts; there was no national emergency related to BCC's business; and the level of supervision by TBTA was less.

It is true that here, as in *Holodnak,* the state owned the land and equipment, BCC did not pay rent, and the state maintained a presence to assure contract compliance. *Holodnak,* 514 F.2d at 289. However, most of the work done at the defendant's plant in *Holodnak* "was performed under contract for the Department of Defense, the Army, Navy, and Air Force." *Holodnak,* 514 F.2d at 289. The Court in *Holodnak* stressed that its decision depended not only on the fact that the defendant operated for the "mutual benefit" of the defendant and the government, but that the government's benefit was its "constitutional interest in raising and supporting an Army, and providing and maintaining a Navy." *Holodnak,* 514 F.2d at 289 (citing U.S. Const. Art. I, § 8, cls. 12, 13) In contrast, in this case there is no "peculiar relationship [which] confers on each an incidental variety of mutual benefits...." *Burton,* 365 U.S. at 724, 81 S.Ct. at 861 ("restaurant is

operated as an integral part of a public building devoted to a public parking service"). It is not enough that the job is helpful to the state. *See Jensen v. Farrell Lines, Inc.*, 625 F.2d at 386–87.

The Court in *Holodnak* held also that "in view of the significance of the Vietnam war as it was perceived in 1969, that each [party] had an overriding interest in avoiding the interruption of production through any sort of labor unrest." *Holodnak*, 514 F.2d at 290. The Court considered and rejected the defendant's argument that a portion of defendant's commercial operations did not involve government contracting, emphasizing the "impact of government participation in defense contracting." *Holodnak*, 514 F.2d at 290 n. 4. Here, there was no public emergency or other particular event, perceived or real, that made TBTA's interest in BCC's business greater than it would otherwise have been. In contrast again, TBTA's participation in BCC's business was limited, and BCC's operations—counting money—were essentially commercial, not a core or constitutional function of government, such as "raising and supporting an Army, and providing and maintaining a Navy." *Holodnak*, 514 F.2d at 289.

### B.

*Close Nexus*

■ "While the symbiotic relationship test focuses on the state's overall relationship with the private actor, the close nexus test specifically examines the state's link to the challenged action." *Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1082 (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)) "Actions by a private party are deemed state action if 'there is a sufficiently close nexus between the State and the challenged action' that the actions by the private parties 'may be fairly treated as that of the state itself.'" *Chan v. City of New York*, at 106 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. at 351, 95 S.Ct. at 453; *see also Hadges v. Yonkers Racing Corp.*, 918 F.2d at 1081.

The "close nexus" test is not satisfied merely by the fact that the private entity is a business "'affected with the public interest'"; or that the state "'approved of or acquiesced in the initiatives'" of the private entity; or that a business is subject to extensive regulation, was publicly subsidized, or had been given monopoly status by the state. *Chan v. City of New York*, at 106 (citations omitted).

■ Although BCC had a contract with TBTA, "[a]cts of ... private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.*, (quoting *Rendell–Baker v. Kohn*, 457 U.S. at 841, 102 S.Ct. at 2771). "The mere existence of a contract between a governmental agency and a private party is insufficient to create state action." *Simescu v. Emmet County Dep't of Social Servs.*, 942 F.2d 372, 375 (6th Cir. 1991) (citing *Dobyns v. E–Systems, Inc.*, 667 F.2d 1219, 1227 (5th Cir.1982)); *see also Domenech Fernandez v. Diversified Info. Sys. Corp.*, 762 F.Supp. 1544, 1546 (D.Puerto Rico 1991) ("The economic association between a defendant and the state is not conclusive evidence that the defendant's conduct can be deemed state action"), *aff'd*, 957 F.2d 44 (1st Cir.1992) (per curiam). That a private entity leases space from a governmental agency does not transform its actions into those of the State. *Simescu*, 942 F.2d at 375; *Wagner v. Metro. Nashville Airport Auth.*, 772 F.2d 227, 229 (6th Cir.1985). That a business is subject to state regulation does not by itself convert its action into that of the state. *See Jackson v. Metro. Edison Co.*, 419 U.S. at 351, 95 S.Ct. at 453; *Gorenc v. Salt River Project Agric. Imp. & Power*, 869 F.2d 503, 507 (9th Cir.), *cert. denied*, 493 U.S. 899, 110 S.Ct. 256, 107 L.Ed.2d 205 (1989) (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972)); *Integrated Info. Serv. v. Mountain States Tel.*, 739 F.Supp. 488, 493 (D.Neb. 1990).

■ BCC cannot enact any laws or perform governmental functions; nor is it immune from laws. *Gorenc*, 869 F.2d at 507. Moreover, if BCC had a "close nexus" with TBTA in any area sufficient to constitute state action, it would not be with regard to

personnel decisions. "Hence, for some purposes, [BCC] is treated like a governmental entity while for other purposes it has only the powers of a private company. In the hiring and firing of employees, [BCC] acts as a private company, that is, in a proprietary manner not in a governmental manner." *Gorenc*, 869 F.2d at 507. Finally, passive consent by TBTA does not constitute state action. *See, e.g., Flagg Bros. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (mere acquiescence by state in private action does not convert that action into state action); *Taylor v. Consol. Edison Co.*, 552 F.2d 39 (2d Cir.), *cert. denied*, 434 U.S. 845, 98 S.Ct. 147, 54 L.Ed.2d 111 (1977).

In her discussion of the "close nexus" test, plaintiff relies on *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), in which the Supreme Court ruled that certain regulations promulgated by the Federal Railroad Administration implicated state action. The regulations at issue in *Skinner* prohibited employees from using or possessing alcohol or controlled substances at work, and from reporting for work while under the influence of such substances. *Skinner*, 489 U.S. at 607, 109 S.Ct. at 1408. The regulations required drug testing of employees who were involved in certain train accidents, and authorized, but did not require, drug testing of employees who violated certain safety rules. 489 U.S. at 604, 109 S.Ct. at 1407. The regulations specified that an employee who refused to submit to testing, required or not, must be withdrawn from service. 489 U.S. at 614, 109 S.Ct. at 1412. The regulations pre-empted state laws and were intended to supersede collective-bargaining agreements and arbitration-awards. 489 U.S. at 614, 109 S.Ct. at 1412.

In contrast, none of the above requirements is present here. TBTA has not promulgated drug testing regulations, and TBTA does not require drug testing. TPTA does not have a policy authorizing drug testing when other agreements or awards prohibit it. TBTA does not require that BCC fire employees who refuse to submit to drug testing, or who test positive for drug use. In fact, as stated above, on one occasion, when TBTA asked BCC to fire several BCC employees who tested positive for drug use, BCC refused.

Moreover, *Skinner* presented a facial challenge to a federal regulation which the Court held had "[s]pecific features [which] combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct." *Skinner*, 489 U.S. at 613, 109 S.Ct. at 1411. This case does not present a facial challenge to any regulation. Instead, plaintiff challenges only the policies and activities of a private company.

Plaintiff is correct that the close nexus test is satisfied, so that private conduct becomes state conduct, where the government requires certain action. The Court in *Skinner* found in the regulations "clear indices of the government's encouragement, endorsement, and participation ... sufficient to implicate the Fourth Amendment." *Skinner*, 489 U.S. at 614, 109 S.Ct. at 1412. Thus, plaintiff claims that *Skinner* stands for the proposition that even regulations which give private companies a choice about whether to test for drug use implicate state action, when that choice is accompanied by "clear indices of the government's encouragement, endorsement, and participation."

However, even assuming *Skinner* stands for such a proposition, there are no "clear indices" of TBTA's participation here. Again, TBTA did not promulgate regulations, and the Contract did not provide that TBTA would play any role in BCC's drug testing. Plaintiff gleans from conversations between TBTA and BCC that TBTA indicated a "preference for testing." (Pl. Mem. at 44 n. 20) However, as discussed in detail above, TBTA's comments never rose to the level of the "encouragement, endorsement, and participation" present in *Skinner*. 489 U.S. at 614, 109 S.Ct. at 1412.

Finally, a decision is not state action if it is based on "judgments made by private parties according to professional standards that are not established by the State." *Blum v. Yaretsky*, 457 U.S. at 1008 & n. 19, 102 S.Ct. at 2788 & n. 19. The Second Circuit has held that "governmental oversight of a private institution does not convert the institution's

decisions into those of the State, as long as the decision in question is based on the institution's independent assessment of its own policies and needs." *United States v. Int'l Bhd. of Teamsters,* 941 F.2d at 1297 (citing *Albert v. Carovano,* 851 F.2d 561, 570–71 (2d Cir.1988) (en banc)).

BCC decided independently to test its employees for drug use, because of its concerns about security. Whether that decision was wise or fair is not at issue—the Constitution "erects no shield against merely private conduct, however discriminatory or wrongful." *Blum v. Yaretsky,* 457 U.S. at 1002, 102 S.Ct. at 2785 (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948)).

## C.

### State Compulsion

■ The "state compulsion" test asks whether a private actor who violates someone's constitutional rights under the "compulsion" or framework of a state law offends the Fourteenth Amendment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 169–70, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970) (black woman who was denied service by restaurant could meet state action requirement by showing a state-enforced custom compelling segregation). Under this test, the private party's actions are "otherwise chargeable to the State ... when the State, by its law, has compelled the act." *Albert v. Carovano,* 824 F.2d at 1341 (citing cases). A private party becomes a state actor when the state has provided "significant encouragement, either overt or covert," for the actions of the parties. *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785; *Rendell–Baker,* 457 U.S. at 840, 102 S.Ct. at 2770.

As in *Hadges v. Yonkers Racing Corp.,* "there is no evidence that a State official participated in [BCC's] decision to [fire plaintiff]." 918 F.2d at 1083. In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court held that a private school's decision to fire a teacher was not state action, even though the state extensively financed and regulated the school, because the ultimate decision was not "compelled or even influenced by any state regulation." 457 U.S. at 841, 102 S.Ct. at 2771. As stated above, TBTA's actions here resemble "[m]ere approval of or acquiescence in," BCC's actions, rather than compulsion. *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785.

## D.

### Public Function

The Supreme Court has held that under the "public function test", "the relevant question is not simply whether the private group is serving a 'public function.' [It] is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772 (emphasis in original) (holding that education is a public function, but is not the exclusive prerogative of the state); *see also Rodriguez–Garcia,* 904 F.2d at 98 (maritime shipping not exclusive prerogative of state); *Ponce v. Basketball Fed'n of Puerto Rico,* 760 F.2d 375, 377 (1st Cir.1985) (regulation of amateur sports not the exclusive prerogative of the state). "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Jensen v. Farrell Lines, Inc.,* 625 F.2d at 385 (quoting *Flagg Bros., Inc. v. Brooks,* 436 U.S. at 158, 98 S.Ct. at 1734); *see also Lefcourt v. Legal Aid Soc'y,* 445 F.2d 1150, 1155 (2d Cir.1971) (substantial governmental funding of Legal Aid Society inadequate to create state action, absent showing of governmental control, regulation, or interference).

If the private actor is functioning as the government, that private actor becomes the state for purposes of state action. *See, e.g., Marsh v. Alabama,* 326 U.S. 501, 506, 66 S.Ct. 276, 278, 90 L.Ed. 265 (1946) ("the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm"); *Gorenc,* 869 F.2d at 508 (citing *Terry v. Adams,* 345 U.S. 461, 469–70, 73 S.Ct. 809, 813, 97 L.Ed. 1152 (1953)). For example, in *Marsh v. Alabama* the Supreme Court held that a company-owned town was acting like a municipality and as such could not abridge

constitutional rights. *Marsh v. Alabama,* 326 U.S. at 509, 66 S.Ct. at 280.

 Plaintiff argues that "revenue collection is one such public function," (Pl. Mem. at 54) and cites *Flagg Bros., Inc. v. Brooks, supra.* However, the Court in *Flagg Bros.* stated only that "*tax* collection"—not revenue collection—was a state function. 436 U.S. at 163, 98 S.Ct. at 1737 (emphasis added). Revenue collection is not tax collection. Not surprisingly, plaintiff does not cite any cases for the proposition that "revenue collection" is the exclusive prerogative of the state.

Moreover, the activity at issue here is not even revenue collection. BCC only counts TBTA's money; it does not collect it. Counting money is traditionally performed by private banks, not the government, and therefore differs from public functions, such as police protection and the provision of prisons, which retain their public nature even when privatized. *See Rodriguez–Garcia,* 904 F.2d at 98. Therefore, BCC is not engaged in activity which is "traditionally the *exclusive* prerogative of the State." *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772.

\*    \*    \*

BCC is operated for private, not public, benefit. In the same way, the armored courier service that transports TBTA's toll receipts to the RIPC is provided by a private company under contract. (S. Conant Dep. at 74–75) A portion of the vault at the RIPC has been designated as a limited branch of National Westminster Bank. (S. Conant Dep. at 127–28) Access to the RIPC is regulated by security guards provided by a private company, not TBTA employees. (*Id.* at 113) BCC is no more a state actor than these other private entities which provide services to TBTA. To hold that BCC was a state actor would suggest that all private companies which contract with TBTA—and perhaps all private companies which contract with any governmental entity—are state actors as well. The Supreme Court has held that "[c]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar,* 457 U.S. at 936, 102 S.Ct. at 2753. Therefore, and for the reasons stated above, defendant's motion for summary judgment is granted, and the case is dismissed.

SO ORDERED.